UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

OLD CORKSCREW PLANTATION, LLC,       Case No. _____

*et al.*,[1]                         Chapter 11 Cases
(Joint Administration Pending)

Debtors.

_____/

## DECLARATION OF SCOTT WESTLAKE IN SUPPORT OF FIRST DAY PLEADINGS

1.     I, Scott Westlake, am a managing member of Four West, LLC, a member of Debtors Old Corkscrew Plantation, LLC ("OCPI"), Old Corkscrew Plantation II, LLC ("OCPII"), Old Corkscrew Plantation III, LLC ("OCPIII"), Old Corkscrew Plantation IV, LLC ("OCPIV"), and Old Corkscrew Plantation VI, LLC ("OCPVI"), and I am the managing member of Old Corkscrew Plantation V, LLC ("OCPV"), the debtors and debtors in possession in the above-captioned Chapter 11 cases (each, a "Debtor," and, collectively, the "Debtors"). In my capacity as managing member of the Debtor entities or of their respective manager members, and as managing member of a member of one or more of the Debtor entities beginning in 2001, I have been actively engaged in Debtors' operations for nine years.

---

[1] The address of each of the Debtors is 22500 State Road 82, Fort Myers, FL 33913; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Old Corkscrew Plantation, LLC (0851); (ii) Old Corkscrew Plantation II, LLC (5121); (iii) Old Corkscrew Plantation III, LLC (3909); (iv) Old Corkscrew Plantation IV, LLC (3911); (v) Old Corkscrew Plantation V, LLC (1515); and (vi) Old Corkscrew Plantation VI, LLC (9990).

2. To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 cases (the "Chapter 11 Cases"), the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (b) reorganize the Debtors and restructure their financial obligations; (c) maintain the confidence and support of key constituencies, and (d) establish procedures for the smooth and efficient administration of these Chapter 11 Cases. The relief requested in these motions is crucial to the success of the Debtors' reorganization efforts.

3. I submit this declaration (the "Declaration") in support of the Debtors' petitions and First Day Motions. In addition to the personal knowledge that I have acquired while working with the Debtors, I also have general knowledge of Debtors' books and records, and I am familiar with the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' members or advisors, or my opinion based upon my experience with the Debtors' operations and financial condition. In making the statements herein based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' members or advisors, I have relied upon the accuracy of the records, documentation and other information.

4. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion.

5. I am authorized to submit this Declaration on behalf of the Debtors.

2

6.	Part I of this Declaration describes the business of the Debtors and the developments which led to the Debtors' filing of their voluntary Chapter 11 petitions. Part II sets forth the relevant facts in support of the various first-day motions and applications filed by the Debtors concurrently herewith. Part III summarizes the Debtors' objectives in these Chapter 11 Cases.

## I. BACKGROUND

### A.	The Chapter 11 Filings

7.	On July 29, 2011 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U. S.C §§ 101 et. seq.

8.	The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

9.	The Debtors commenced these Chapter 11 Cases to obtain the financial flexibility to restructure their finances. The Debtors will work diligently to file a Chapter 11 plan within the exclusive period in order to minimize fees, preserve the value of their assets and maximize the availability of recovery for their stakeholders.

### B.	Overview of the Debtors

10.	Each of the Debtors is a Florida limited liability company, organized under Florida law in OCPI, OCPII, OCPIII and OCPIV were formed in 2002. OCPV and OCP VI were formed in 2005. The Debtors were formed for the purpose of acquiring the citrus grove properties known generally as Old Corkscrew Plantation. The Old Corkscrew Plantation ("OCP") is comprised of approximately 5,625 acres of land owned by Debtors located in Estero, Florida in Southeastern Lee County between Fort Myers and Naples, Florida, approximately 4,622 acres of which are under cultivation as citrus groves. The land is currently a cash-flowing citrus grove with

3

varieties that include oranges for juice production, fresh Red Grapefruit, Fallgo Tangerines, Sunburst Tangerines, Orlando Tangerines, Honey Tangerines and a small amount of Navel Oranges. Currently, OCP accounts for approximately 1.2% of Florida's total citrus production.

11.     OCP's land is located south of State Road 82 and extends south of Corkscrew Road. It is located approximately 10 miles east of the Ft Myers/Regional Airport.

12.     The land was acquired in a number of transactions from 2002 through 2005. The land is owned by the six Debtor entities.

13.     OCP is currently operated as citrus groves, has positive cash flow and advantageous tax benefits via depreciation with no recapturing of the depreciation expense required.

14.     Citrus is harvested annually. Early orange varieties are harvested from late December through February. The early varieties account for approximately 35% of OCP's orange production. Late oranges start harvesting after the early harvest is complete and go through June. These varieties account for 65% of OCP's orange production.

15.     The groves also produce red grapefruit, tangerines, and tangelos, which are sold as fresh fruit, They represent about 15% of total revenues. Fruit picked for juice is sent to a processor and can be found in Minute Maid and Tropicana brands of orange juice, and represents approximately 85% of revenue.

16.     OCP is among the southernmost orange groves in Florida, originally planted following the freezes in Orlando in the early 1980s. Due to their southern location, the groves are far less susceptible to freezing.

17.     The groves are managed by Arcadia Citrus Management, Inc. of Fort Myers, Florida. Brian Bartholomew owns Arcadia Citrus Management, Inc., and also is an owner/member of BB Citrus Holdings, LLC, which is a 3% owner of OCP-V and a 3% owner of of OCP-VI.  Mr.

Bartholomew is an experienced, lifelong citrus farmer with more than thirty years of experience in all aspects of grove management and production. Arcadia Citrus Enterprises, Inc. was established in 1983, and has been managing Debtors' citrus groves for years. Mr. Bartholomew is a board member of Dundee Citrus Growers Cooperative, a past Board Member of U.S.D.A. Farm Service Agency for 12 years, a licensed and bonded fruit dealer, and a member of the Florida Horticulture Society, Gulf Citrus Growers Association and Farm Credit of Southwest Florida. He attended Auburn University for Agriculture Science and Business, holds a degree in Citrus Production Technology from Edison College, and holds a commercial pesticide license.

18.     One hundred percent of OCP's orange production has been purchased most recently by Cutrale (Minute Maid) and Tropicana. Cutrale has contracted to purchase the oranges for the next five crop years. The fresh fruit is contracted to Dundee.

19.     In 2007, the owners of the groves commissioned MGS Groundwater Science ("MGS"), a Schlumberger Company, to perform a study to determine the mineral content of the land. The study focused on the 4,800 acres between SR-82 and Corkscrew Road. A detailed geologic assessment of the site was made using the sonic drilling technique. Seventy sonic cores were collected through the entire geologic section from land surface to the base of economic benefit. MGS determined that the site is underlain by a high quality deposit of sand and limestone that can be successfully used to produce: fill, processed sand, base rock, aggregate, screenings and washings.

20.     The sand and limestone deposits identified by MGS would provide a viable source of construction materials for roads and other large infrastructure projects programmed within Lee County and South Florida.

21.     Based on the site plan, setbacks, side-slopes and reclamation areas required, MGS estimates the following quantities of raw material are available (plus or minus 10%):

5

High Quality Limestone 65.7 – 66.3 million tons
Total Limestone Thickness 390.5 – 392.8 million tons
Fill (Top Sand) 81.2 – 82.1 million tons
Other Material 65.7 – 68.7 million tons

Post-processing, rock and sand products are estimated to be:

Aggregate 57.8 – 58.3 million tons
Base Rock 292.9 – 293.3 million tons
Fill 42.1 – 43.3 million tons
Processing Sand 32.5 – 32.8 million tons
Screenings 55.2 – 56.4 million tons
Washings 37.0 – 39.2 million tons

22.     Florida is the third largest aggregate market in the United States and imports a significant amount of the required material. Locally sourced reserves of aggregate are depleting and the Florida Department of Transportation ("FDOT") has reported projections of less than seven years of reserves remaining.

23.     The Debtors believe the aggregate reserves on the properties are in the range of approximately five billion dollars and that the life expectancy of the mine would be on the order of 20 to 30 years. Any estimate of value has to take into account that the price of rock products varies considerably within the market place according to the balance of supply and demand, and the transportation cost to haul aggregate and base rock to road construction and other sites also must be considered. The price of some rock and sand products has fluctuated widely in recent years, the price of higher grade materials, such as aggregate and base rock, is less volatile and in the long-term will increase because of the limited availability and transportation cost. The value estimate is calculated as follows:

| | Estimated Tons | | Price/ Ton | Gross Market Value in millions of dollars | |
|---|---|---|---|---|---|
| Aggregate | 57.8 | 58.3 | $14.25 | $823.7 | $830.8 |
| Base Rock | 292.9 | 293.3 | $9.00 | $2,636.1 | $2,639.7 |

| | | | | | |
|---|---|---|---|---|---|
| Fill | 42.1 | 43.3 | $6.00 | $252.6 | $259.8 |
| Processed Sand | 32.5 | 32.8 | $10.00 | $325.0 | $328.0 |
| Screenings | 55.2 | 56.4 | $13.25 | $731.4 | $747.3 |
| Washings | 37.0 | 39.2 | $5.50 | $203.5 | $215.6 |
| | 517.5 | 523.3 | | $4,972.3 | $5,021.2 |

24.    The Debtors have begun the process of obtaining necessary permits and zoning to allow the mining operation, a multi-year process.

25.    Following receipt of environmental permits and local zoning approval, a Mining Development Order (MDO) must be approved by Lee County prior to any excavation. Several other permits are required, such as a FDOT connection permit and SFWMD Water Use Permit. These permits are routinely issued in a short timeframe.

26.    The Debtors propose to continue to operate the citrus groves for cash flow while completing the zoning and permitting process.

27.    After completion of the zoning and permitting process, the Debtors anticipate beginning to extract aggregate in a phased mining operation beginning in the northern section of the groves. The citrus groves unaffected by the mining operation will continue to be operated for cash flow.

28.    As the citrus groves are removed, water usage will decline. Lehigh Acres, a nearby neighborhood, does not have its own water source and is in need of additional water supplies. The groves are currently permitted for 33M gallons of water per day. Debtors should be able to monetize their permitted water. Initial valuation estimates value the permitted water between $1 – $2 per day/gallon.

29.     Long term prospects also include the potential for an electric generation facility to be located on the property due to the site's characteristics and existing power transmission lines that are located on the property.

30.     After mining is completed, the site may have beautiful lakes around which residential housing can be built. The property has approximately one mile of frontage real estate on SR-82 which can be used for commercial development.

## II. CURRENT DEBT STRUCTURE

31.     Debtors are indebted to M&I Marshall & Ilsley Bank ("M&I" or "Lender") under three promissory notes in the original principal amounts of $40,000,000.00, $20,000,000.00 and $5,000,000, evidenced by the following promissory notes:

(a)     Amended and Restated Term Note dated August 1, 2006 in the original principal amount of $40,000,000.00 in favor of M&I amended by the First Modification to Promissory Note dated as of December 31, 2009 (the "40MM Note");

(b)     Term Note dated August 1, 2006 in the original principal amount of $20,000,000.00 in favor of M&I amended by the First Modification to Promissory Note dated January 25, 2008 and the Second Modification to Promissory Note dated as of December 31, 2009 (the "20MM Note");

(c)     Amended and Restated Promissory Note dated October 28, 2008 in the original principal amount of $5,000,000.00 in favor of M&I amended by the First Modification to Promissory Note dated December 31, 2009 (the "5MM Note").

32.     As of May 26, 2011, the unpaid balance on the 40MM Note was $33,434,354.05; the unpaid balance on the 20MM Note was $16,000,000; and the unpaid balance on the 5MM Note was $5,000,000.

8

33. In connection with the Loans evidenced by the $40MM Note and the $20MM Note, Debtors executed a Loan Agreement dated August 1, 2006.

34. The $40MM Note, the $20MM Note and the $5MM Note are secured by (i) an Amended and Restated Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by OCPI, OCPII, OCPIII, OCPIV and OCPV in favor of Lender; (ii) a Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by OCPVI and Felda Plantation, LLC[2] in favor of Lender. The $5MM Note and a separate Note in the amount of $17, 600,000 executed by Felda Plantation, LLC are secured by a mortgage against property of Felda Plantation, LLC. Debtors' obligations under the above-described notes are guaranteed under limited Guaranty Agreements executed by Franz Rosinus and Scott Westlake.

35. Pursuant to the Modification Agreements described above, the $40MM Note, $20MM Note and $5MM Note mature on December 31, 2011.

36. On or about May 12, 2011, M&I exercised a setoff against debtor's deposit account in the amount of $1,500,000. On or about May 16, 2011, M&I set off $565,645.95 against Declarant's personal deposit account against Debtors' indebtedness on the above-described Notes. Pursuant to a Forbearance Agreement entered between Debtors and M&I providing for a forbearance period to end no later than December 31, 2011, on or about May 27, 2011, M&I applied an additional approximately $636,670.23 from the Debtors' deposit account in payment of installments of interest provided for in the Forbearance Agreement.

37. M&I has indicated to the Debtors that it is unwilling to extend the payment of the unpaid balance on the above notes beyond December 31, 2011.

---

[2] Felda Plantation, LLC is a related entity.

9

38.     The Debtors have sought to arrange alternate financing to enable them to pay indebtedness to M&I, and repay an alternate lender on over time at a reasonable market rate of interest, but to date have not been able to do so.

### III. FIRST-DAY MOTIONS

39.     Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing a number of First Day Motions. The Debtors request that the Court conduct a hearing as soon as possible after the commencement of the Debtors' Chapter 11 Cases (the "First Day Hearing"), during which the Court will hear arguments of counsel with respect to the First Day Motions.

40.     I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to preserve their going concern value, to maximize the value of their assets for all creditors of their estates, and to avoid immediate and irreparable harm to the Debtors' estates.

**A.     Debtors'** *Ex Parte* **Motion for Joint Administration (the "Joint Administration Motion")**

41.     The Debtors believe that it would be more efficient for the administration of these cases if joint administration were authorized. The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for all the Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied. Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

42.     The Debtors submit that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of these cases. The Debtors filed the Joint Administration

10

Motion on an *ex parte* basis. I am advised by counsel that joint administration is authorized by Bankruptcy Rule 1015(b). The Debtors submit that the entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in their best interests and those of their creditors.

**B.** **Debtors'** *Ex Parte* **Motion for Authorization to File Consolidated Chapter 11 Case Management Summary**

43.     I am advised that in accordance with Administrative Order FLMB-2009-1(A), a debtor in possession in a Chapter 11 case is directed to file with the Court, within the earlier of three business days after relief is entered, or the day of the first scheduled hearing, a completed Chapter 11 Case Management Summary (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors.

44.     The Debtors request authority to file a consolidated Case Management Summary reflecting the assets, liabilities and financial information of each of the Debtors, as the filing of a separate Case Management Summary for each of the numerous Debtors would be burdensome and duplicative. The principal reason for this request is that the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

45.     The Debtors do not believe that the U. S. Trustee will oppose the relief requested by this motion. The Debtors believe that filing a consolidated Case Management Summary provides creditors and parties in interest with the financial disclosures contemplated by Administrative Order FLMB-2009-1(A).

11

## C. Debtors' Application for Order Authorizing, On an Interim and Final Basis, Employment of Berger Singerman, P.A., as Counsel for Debtors in Possession Nunc Pro Tunc to Petition Date

46.     The Debtors seek authority to retain, on an interim and final basis, Paul Steven Singerman and the law firm of Berger Singerman, P.A. ("BSPA") as general bankruptcy counsel *nunc pro tunc* to the Petition Date. The Debtors understand that Mr. Singerman and BSPA have extensive experience representing Chapter 11 debtors in this district and others across the country and that they are well-qualified to serve as general bankruptcy counsel to the Debtors. The Debtors believe it is in their best interests, and those of their creditors, that Mr. Singerman and BSPA be retained to serve as Debtors' general bankruptcy counsel in their Chapter 11 Cases.

47.     To the best of the Debtors' knowledge, except as disclosed in the Declaration of Paul Steven Singerman on behalf of Berger Singerman, P.A., neither Mr. Singerman nor BSPA has any connection with the Debtors' creditors or other parties in interest or their respective attorneys. Counsel has informed me that corporations may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf. Because there is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtors require the Court's approval of the use of cash collateral. Without the ability to use its cash, the Debtors will be unable to operate and maximize value for the benefit of their estates. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief, as contemplated by Bankruptcy Rule 6003, has been granted in other large Chapter 11 cases in the

12

State of Florida, including this district. *See, e.g., In re Robb & Stucky Limited LLLP*, Case No. 8-11-bk-02801-CED (Bankr. M.D. Fla. Feb. 24, 2011); *In re Medical Staffing Network Holdings, Inc., et al.*, Chapter 11 Case No. 10-29 101-BKC-EPK (Bankr. S.D. Fla. July 8, 2010); *In re Gemini Cargo Logistics, Inc., et al.*, Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Financial Services, LLC*, Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Jan. 28, 2008); *In re Tousa, Inc.,et al.*, Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008), and by other bankruptcy courts throughout the country.

**D.    Debtors' Application for Order Authorizing, On an Interim and Final Basis, Employment of McDowell, Rice, Smith and Buchanan, P.C., as Counsel for Debtors in Possession Nunc Pro Tunc to Petition Date**

48.    The Debtors seek authority to retain, on an interim and final basis, R. Pete Smith and the law firm of McDowell, Rice, Smith & Buchanan, P.C. ("MRSB") as general bankruptcy counsel *nunc pro tunc* to the Petition Date. The Debtors understand that Mr. Smith and MRSB have extensive experience representing Chapter 11 debtors in cases in Missouri and across the country and that they are well-qualified to serve as general bankruptcy counsel to the Debtors. The Debtors believe it is in their best interests, and those of their creditors, that Mr. Smith and MRSB be retained to serve as Debtors' general bankruptcy counsel in their Chapter 11 Cases. BSPA and MRSB will communicate with each other so as to avoid to the extent possible duplication of efforts and work in an efficient manner throughout the Debtors' Chapter 11 Cases.

49.    To the best of the Debtors' knowledge, except as disclosed in the Declaration of R. Pete Smith on behalf of McDowell, Rice, Smith & Buchanan, P.C., neither Mr. Smith nor MRSB has any connection with the Debtors' creditors or other parties in interest or their respective attorneys. Counsel has informed me that corporations may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf. Because there

13

is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtors require the Court's approval of the use of cash collateral. Without the ability to use its cash, the Debtors will be unable to operate and maximize value for the benefit of their estates. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief, as contemplated by Bankruptcy Rule 6003, has been granted in other large Chapter 11 cases in the State of Florida, including this district. *See, e.g., In re Robb & Stucky Limited LLLP,* Case No. 8-11-bk-02801-CED (Bankr. M.D. Fla. Feb. 24, 2011); *In re Medical Staffing Network Holdings, Inc.,* et al., Chapter 11 Case No. 10-29 101-BKCEPK (Bankr. S.D. Fla. July 8, 2010); *In re Gemini Cargo Logistics, Inc., et al.,* Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Financial Services, LLC,* Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Jan. 28, 2008); *In re Tousa, Inc., et al.,* Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008), and by other bankruptcy courts throughout the country.

**E. Debtors' Application for an Order Authorizing Employment and Retention of Kapila & Company and Soneet R. Kapila as Chief Restructuring Officer to the Debtors, *Nunc Pro Tunc* to the Petition Date**

50. The Debtors seek entry of an order authorizing, on an interim and final basis, approving the retention of Kapila & Company ("Kapila & Co.") to provide restructuring management services, including providing the services of Soneet R. Kapila to serve as the Chief Restructuring Officer ("CRO") of the Debtors. In support of this Application, the Debtors rely upon the *Declaration of Soneet R. Kapila in Support of the Debtors' Application for an Order*

14

*Authorizing Employment and Retention of Kapila and Company and Soneet R. Kapila as Chief Restructuring Officer to the Debtors, Nunc Pro Tunc to Petition Date* (the "Kapila Declaration") attached as Exhibit A to the Application. The Debtors seek to employ Kapila & Co. pursuant to the terms of the Engagement Letter dated July 14, 2011 (the "Engagement Letter") attached as Exhibit B to the Application. As per the terms contained in the Engagement Letter, Kapila & Co. has agreed to provide restructuring management services, including providing Mr. Kapila to serve as CRO. Working collaboratively with the senior management team and the Debtors' other professionals, Mr. Kapila and Kapila & Co. will assist the Debtors in evaluating and implementing strategic and tactical options through the restructuring process. A more detailed explanation of the services to be rendered is set forth in the Engagement Letter.

51.     The terms of Kapila & Co.'s proposed compensation are fully set forth in the Engagement Letter. Specifically, Kapila & Co. will be paid monthly at Kapila & Co.'s customary and usual hourly rates as well as reimbursement of its reasonable out-of-pocket expenses.

52.     Because Kapila & Co. is not being employed as a professional under section 327 of the Bankruptcy Code, it will not be submitting fee applications pursuant to section 330 and 331 of the Bankruptcy Code. Kapila & Co., however, will submit to this Court quarterly reports of compensation earned. Parties in interest shall have the right to object to fees paid when quarterly reports of compensation earned are filed with this Court. The first quarterly report will be submitted forty-five (45) days from the end of the first calendar quarter after the Petition Date and will cover the period to and including the last day of the first quarter after the Petition Date. This procedure will continue at three-month intervals thereafter.

53.     In the Engagement Letter, the Debtors agree, among other things, to indemnify, hold harmless and defend Kapila & Co. to the same extent as the most favorable indemnification provided to the Debtors' officers and directors. The Debtors shall also maintain any such insurance for the CRO for a period of not less than two years following the date of the termination of such officer's services pursuant to the Engagement Letter. The indemnity provisions of the Engagement Letter are incorporated therein and termination of that Engagement Letter shall not affect those provisions, which shall survive termination.

54.     I understand that Kapila & Co. and its professionals and employees have a wealth of experience in providing crisis management services to financially-troubled organizations. I further understand that Kapila & Co. is a Florida accounting and consulting firm, has substantial experience in financial consulting and is qualified to provide interim management services to the Debtors. I further understand that the certified public accountants of Kapila & Co. have expertise in all areas of commercial accounting and finance, including distressed business restructuring, business valuations, business analysis, and insolvency and tax consulting.

55.     I further understand that Mr. Kapila is well qualified to act as CRO. Mr. Kapila's practice is concentrated in the area of creditors' rights, bankruptcy, and financial transactions litigation. He represents both creditors and debtors in and out of bankruptcy court, and has considerable expertise representing secured creditors. I further understand that Mr. Kapila also regularly advises clients about the insolvency implications involved in business transactions and operation of distressed businesses. I further understand that as a fiduciary, Mr. Kapila has served as Bankruptcy Trustee, Examiner, Chief Restructuring Officer, S.E.C. Corporate Monitor and Receiver and State Court Receiver in numerous matters in the Southern and Middle Districts of Florida, and that Mr. Kapila has advised and represented debtors and creditors' committees in

16

formulating, analyzing and negotiating plans of reorganization. I further understand that Mr. Kapila is a recognized expert in fraudulent conveyance and insolvency issues and has provided expert testimony and extensive litigation support services to law firms involving complex insolvency issues, and that he is a sitting trustee on the panel of U.S. Bankruptcy Trustees in the Southern District of Florida.

56. I further understand that Mr. Kapila has conducted numerous forensic and fraud investigations, and has worked in conjunction with the S.E.C., the Federal Bureau of Investigation and the United States Attorney's Office. Mr. Kapila has also provided a wide variety of tax services to clients throughout his career. I further understand that consulting with and offering tax planning strategies and ideas to bankruptcy trustees is also a significant part of his responsibilities.

57. Debtors' counsel has advised me that under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represent a reasonable business judgment on the part of the debtor, such use should be approved. Counsel has further advised me that the retention of interim corporate officers is proper under section 363 of the Bankruptcy Code, and that numerous courts, including the United States Bankruptcy Court for the Middle District of Florida, have authorized retention of officers utilizing this provision of the Bankruptcy Code. *See, e.g., In re Robb & Stucky Limited LLLP,* Case No. 8:11-bk-02801-CED (Bankr. M.D. Fla. Mar. 25, 2011); *CCI Liquidation, Inc., fka Custom Cable Industries, Inc.,* Case No. 10-18478-MGW (Bankr. M.D. Fla. Aug. 13, 2010).

58. Based on the foregoing, I submit that the employment of Kapila & Co. under the terms and conditions contained in the Engagement Letter would greatly benefit the Debtors' estates and creditors.

17

**F. Debtors' Application for Order Authorizing Employment of Arcadia Citrus Enterprises, Inc. as Manager for Debtors Nunc Pro Tunc to Petition Date**

59.    The Debtors seek authority to retain Arcadia Citrus Enterprises, Inc. ("Arcadia") as Manager for the operation of Debtors' citrus growing properties *nunc pro tunc* to the Petition Date. Arcadia has provided management services to the Debtors in connection with their citrus growing operations for several years prior to the Petition Date. The Debtors believe it is in their best interests, and those of their creditors, that Arcadia be retained to serve as Debtors' Manager.

60.    To the best of the Debtors' knowledge, except for Mr. Bartholomew who owns Arcadia and who is also an owner/member of BB Citrus Holdings, LLC, which is a 3% owner of OCPV and a 3% owner of OCPVI, neither Mr. Bartholomew nor Arcadia has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

61.    The terms and conditions of the employment by the Debtors of Arcadia, and the services Arcadia will provide, are set forth in detail in the *Management Agreement* (the "MA") attached to the Application as Exhibit "A."

62.    The terms and conditions of the employment by the Debtors of Arcadia, and the services Arcadia will provide, are set forth in detail in the *Management Agreement* (the "MA") attached hereto as Exhibit "A" and incorporated herein.[3]

63.    The services to be provided by Arcadia are set forth in Section 3(a)-(e) of the MA including, but not limited to, providing "all labor and services needed to grow and harvest the Crop," create a harvest schedule, commence and continue applicable planting and cultivation activities, infestation and diseases to the citrus crop and maintain security.

---

[3] All capitalized terms not defined herein shall have the meanings ascribed to them in the MA.

64.    The terms of compensation are set forth in Section 6 of the MA. Specifically, on the 15th of each month, the Debtors shall cause to be paid to Manager as a fee for services rendered Five and No/100 Dollars ($5.00) per care of property for the preceding month's services. This management fee includes, without limitation, all of Manager's general and central office overhead expenses, including, but not limited to, postage, express mail, and long distance telephone charges as well as office employees necessary to be employed in the normal management and operation of the Debtors' properties.  Manager will comply with budgets provided by the Debtors from time to time.

65.    Because Arcadia is not being employed as a professional under section 327 of the Bankruptcy Code, it will not be submitting fee applications pursuant to section 330 and 331 of the Bankruptcy Code.

66.    Based on the foregoing, I submit that the employment of Arcadia under the terms and conditions contained in the MA would greatly benefit the Debtors' estates and creditors.

## G.    Debtors' Motion for Order Establishing Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals (the "Interim Compensation Procedures Motion")

67.    The Debtors request the Court to enter an order establishing a procedure for compensating and reimbursing estate retained professionals on a monthly basis, comparable to those established in complex Chapter 11 cases in this and other districts. In this way, the Court and parties-in-interest can more effectively monitor the fees incurred, and the Debtors will be able to more effectively budget their payments of professional fees, rather than suffer depletions to cash flow on an irregular basis.

68.    In connection with these Chapter 11 Cases, the Debtors have filed Applications to retain BSPA and MRSB as their general bankruptcy counsel. Because of the likelihood that the

19

Debtors will seek to employ additional professionals, the process of such professional fee applications may well be burdensome on the Debtors, these professionals and the Court. Thus, implementation of compensation procedures will provide a streamlined and otherwise efficient method for compensating professionals and, as stated, such procedures will allow the Court and parties in interest to monitor fees sought by and paid to such professionals.

69.     In summary, the requested monthly compensation procedure would require all professionals retained with Court approval to present to (i) the Debtors; (ii) counsel for the Debtors; (iii) counsel for the Official Committee of Unsecured Creditors, if one is established; (iv) any other appointed committee; (v) M&I Marshall & Ilsley Bank; and (vi) the Office of the United States Trustee a detailed statement of services rendered and expenses incurred for the prior month. If no timely objection is filed, the Debtors would promptly pay 80% of the amount of fees incurred for the month, with a 20% holdback, and 100% of out-of-pocket expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process (approximately every 120 days).

70.     The Debtors have been advised by counsel that the form of relief sought in the Interim Compensation Procedures Motion has been granted in several large Chapter 11 cases in Florida, including in this district. *See, e.g., In re Robb & Stucky Limited LLP*, Chapter 11 Case No. 08-11-bk-02801-CED (Bankr. M.D. Fla. Mar. 31, 2011); *In re Fiddler's Creek, LLC*, Case No. 9:10-bk-03846-ALP (Bankr. M.D. Fla. April 28, 2010); and *In re Land Resource, LLC*, Case No. 6:08-bk10159 (Bankr. M.D. Fla. Nov. 7, 2008). The Debtors submit that the entry of an Order approving these procedures will be in the Debtors' best interests and those of their creditors.

**H.     Debtors' Motion for Authorization to (I) Continue to Administer Insurance Policies (the "Insurance Motion")**

71.     The Debtors seek authority, in their reasonable business judgment, to (i) continue to administer the General Liability Insurance, the Pollution Insurance, the Crop Insurance Policies, the Life Insurance Policies and any other existing similar obligations (collectively, the "Insurance Policies"). The Debtors further request authority to pay all such amounts in the ordinary course of their business.

**(a)     General Liability Insurance Policy**

1.     The Debtors maintain a general liability insurance policy (the "General Liability Insurance") through FCCI Insurance Company. The General Liability Insurance policy provides for payment of premiums in four installments, including an initial payment of approximately 35% to the total premium followed by three quarterly installments. All premiums due under the General Liability Insurance policy are more particularly described in Exhibit "A" to the Insurance Motion. The General Liability Insurance is critical to the Debtors as it provides coverage for bodily injury and property damage claims the company is legally obligated to pay due to, or resulting from, its business operations. In the ordinary course of the Debtors' businesses, absent the General Liability Insurance, the Debtors would be forced to bear the administrative costs and expenses of defense litigation and adverse judgments. I have been advised by counsel that maintenance of the General Liability Insurance is also mandatory under the United States Trustee Guidelines, and many state and federal laws. The General Liability Insurance must be maintained in order to avoid potential immediate and irreparable harm to the Debtors and to ensure compliance with all state and federal laws, rules, and regulations. The Debtors' General Liability Insurance policy expires on June 14, 2012. The Debtors have paid

21

the initial installment of the required yearly premium payment of $16,408.68. The next payment of $3,555.76 is due on September 14, 2011.

### (b) Pollution Insurance Policy

72. Debtor, Old Corkscrew Plantation III, LLC maintains a pollution insurance policy through Lutgert Insurance Company (the "OCP III Pollution Policy"). The OCP III Pollution Policy provides for payment of premiums on an annual basis. The OCP III Pollution Policy provides coverage for underground storage tanks located on the business premises. All premiums due under the OCP III Pollution Policy are paid through August 1, 2012. Old Corkscrew Plantation III, LLC has paid the required yearly premium payment of $521.67.

73. Debtor, Old Corkscrew Plantation V, LLC maintains a pollution insurance policy through Commerce Insurance Company (the "OCP V Pollution Policy"). The OCP V Pollution Policy provides for payment of premiums on an annual basis. The OCP V Pollution Policy provides coverage for underground storage tanks located on the business premises. All premiums due under the OCP V Pollution Policy are paid through March 10, 2012. Old Corkscrew Plantation V, LLC has paid the required yearly premium payment of $802.64.

### (c) Crop Insurance

74. Each of the Debtors maintains policies insuring their respective crops (the "Corp Insurance Policies") through the United States Department of Agriculture, Federal Crop Insurance Corporation. The Crop Insurance Policies provide for the payment of premiums in installments. All premiums due under the Crop Insurance Policies are more particularly described on Exhibit A attached to the Insurance Motion. The Crop Insurance Policies provide coverage for losses due to freeze, wind, excess moisture, flooding, insect and disease. No premium payment is due under the Crop Insurance Policies until March, 2012.

22

### (d) Life Insurance Policies

75. The Debtor maintains term life insurance policies for each of Scott Westlake and Franz Rosinus through Symetra Life Insurance Company (the "Life Insurance Policies"). The Life Insurance Policies provide term life coverage for myself and Mr. Rosinus. All premiums due under the term Life Insurance Policies are paid through April 2011. The Debtors have paid the required initial premium payment of $7,230.61 in April 2011 with the second payment due in October 2011.

76. To the extent that any of the Insurance Policies may be deemed executory contracts, the Debtors do not at this time seek authority to assume the contracts. The Debtors request only authorization to continue the programs, pay claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the policies in force.

77. Authorization for the Debtors to (i) continue to administer the Insurance Policies, and (ii) continue to pay claims and/or premiums to the extent they may become due and payable according to the terms of such policies in the ordinary course of their business is critical to the continued operation of the Debtors' businesses. Accordingly, I believe that grounds exist to grant the relief requested in the Insurance Motion.

**I.     Debtors' Motion For (A) Authority To (I) Maintain Bank Accounts And To Continue To Use Existing Business Forms And Checks, And (Ii) Continue To Use Existing Cash Management System; And (B) Waiver Of Certain Investment And Deposit Guidelines**

78. The Debtors seek entry of an order (a) authorizing (i) the continued use of their existing Bank Account and continued use of existing Business Forms and checks, and (ii) the continued use of the existing Cash Management System; and (b) waiving investment and deposit

23

guidelines of Section 345 of the Bankruptcy Code and those guidelines promulgated by the Office of the United States Trustee (the "Guidelines").

79.     Prior to the commencement of these Chapter 11 cases, in the ordinary course of its business, the Debtors utilized M&I to collect, transfer and disburse funds generated on a daily basis from its operations. The amount on deposit in Debtors' Bank Account as of the Petition Date is $838,307.32. The Bank Account is part of a Cash Management System that Debtors employ in the ordinary course of their businesses which ensures the Debtors' ability to efficiently monitor and control their cash position, as is more fully described below.

80.     The Debtors' Cash Management System is run through the Bank Account. The Bank Account is in the name of Old Corkscrew Plantation, LLC; however, receipts from each of the Debtors are deposited into the Bank Account and expenditures are made on behalf of each of the Debtors *pro rata* based upon the amount of acreage owned by each Debtor. Contemporaneous records are maintained so that there is documentation reflecting deposits into and expenditure from the Bank Account to third parties.

81.     The Debtors' Cash Management System is centrally managed by Arcadia Citrus Enterprises, Inc., the entity that manages the Debtors' business operations. Through the utilization of the existing Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the Bank Account required to effect the collection, disbursement and movement of cash. The Cash Management System used by the Debtors constitutes ordinary, usual, and essential business practices. This system allows the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses.

82.     The Debtors' operations require that its Cash Management System continue during the pendency of these Chapter 11 cases. If the Debtors were required to adopt a new Cash Management System, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to reorganize. Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' estate. Accordingly, maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

83.     Counsel has advised me that the Office of the United States Trustee has established certain operating Guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. According to counsel, these Guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. Further according to counsel, the Guidelines also require debtors to close their books and records as of the petition date and to open new books and records. I am advised by counsel that these requirements are designed to provide a clear line of demarcation between prepetition and post-petition transactions and operations and to prevent the inadvertent post-petition payment of prepetition claims. Through this Motion, the Debtors seek relief from these requirements.

84.     The Debtors seek a waiver of the requirement that it open a new set of books and records as of the Petition Date. I believe that opening a new set of books and records would

create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date. The Debtors, in the ordinary course of its business, use checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, I believe that the Debtors should be authorized to continue to use its existing business forms and to maintain their existing business records.

85. In addition, I am advised by counsel that Section 345(b) of the Bankruptcy Code sets forth specific requirements for deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States . . . ." I am further advised that for such deposits or investments, Section 345(b) requires, from the entity with which the money is deposited or invested, a bond in favor of the United States secured by the undertaking of a surety, or, in the alternative, a deposit of securities of the kind specified in section 9303 of title 31. I am further advised that these requirements may be waived by the Court "for cause."

86. Because of the nature of the Debtors' cases, and the nature, extent, and complexity of the Debtors' operations, the Debtors seek a waiver of the requirements of the Office of the United States Trustee and Section 345. I believe that the benefits of imposing the requirements of the Office of the United States Trustee in this case are outweighed by the cost

26

and disruption of opening a new account(s), obtaining new check stock, manually preparing checks until the new check stock arrives, and the like. I also believe that "cause" exists to waive the requirements of Section 345. The Debtors believe that M&I is a financially stable banking institution, and is FDIC insured and counsel has advised that it is an authorized depository pursuant to Section 345(b) for Region 21.

87.     The Debtors' Bank Account comprises an established Cash Management System that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Account are not disrupted. The Debtors will note, in their respective records, the date and times their Chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement from the Bank Account. Accordingly, the Debtors request that their existing Bank Account be deemed a debtor-in-possession account, and that its maintenance and continued use be authorized.

88.     The Debtors also request that they be authorized to continue to use all correspondence, business forms (including without limitation, letterheads, purchase orders, and invoices) and checks existing immediately prior to the date the Debtors filed for bankruptcy, without reference to the Debtors' status as debtors-in-possession. Vendors doing business with the Debtors will likely be aware of the Debtors' status as debtors-in-possession as a result of receipt of notice of the commencement of these Chapter 11 cases. Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations. For these reasons, the Debtors request that they be authorized to use existing checks and business forms.

89.     Based on the foregoing, I believe that it is appropriate for the Court to grant the relief requested in the Case management Motion.

**J.    Debtors' Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, and (ii) Granting Adequate Protection (the "Cash Collateral Motion")**

90.    The Debtors seek the entry of an interim order (the "Interim Order") authorizing, on an emergency and limited basis, use of "Cash Collateral" (as that term is defined in Section 363(a) of the Bankruptcy Code). An immediate and critical need exists for the Debtors to be permitted access to Cash Collateral to continue to operate.  Therefore, the Debtors seek an emergency preliminary hearing (the "Preliminary Hearing") in accordance with Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedures. At the Preliminary Hearing, the Debtors will seek entry of an Interim Order. The Debtors further seek a final hearing (the "Final Hearing") on the Cash Collateral Motion, to be held no less than fifteen (15) days from service of a notice of hearing on such Final Hearing.

91.    Debtors are indebted to M&I under three promissory notes in the original principal amounts of $40,000,000.00, $20,000,000.00 and $5,000,000, evidenced by the following promissory notes:

(a)    Amended and Restated Term Note dated August 1, 2006 in the original principal amount of $40,000,000.00 in favor of M&I amended by the First Modification to Promissory Note dated as of December 31, 2009 (the "40MM Note");

(b)    Term Note dated August 1, 2006 in the original principal amount of $20,000,000.00 in favor of M&I amended by the First Modification to Promissory Note dated January 25, 2008 and the Second Modification to Promissory Note dated as of December 31, 2009 (the "20MM Note");

(c)    Amended and Restated Promissory Note dated October 28, 2008 in the original principal amount of $5,000,000.00 in favor of M&I amended by the First Modification to Promissory Note dated December 31, 2009 (the "5MM Note").

92.     As of May 26, 2011, the unpaid balance on the 40MM Note was $33,434,354.05; the unpaid balance on the 40MM Note was $16,000,000; and the unpaid balance on the 5MM Note was $5,000,000. In connection with the Loans evidenced by the $40MM Note and the $20MM Note, Debtors executed a Loan Agreement dated August 1, 2006.

93.     The $40MM Note, the $20MM Note and the $5MM Note are secured by (i) an Amended and Restated Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by OCPI; OCPII; OCPIII; OCPIV and OCPV in favor of the Lender; and (ii) a Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by OCPVI and Felda Plantation, LLC in favor of Lender (the "Felda Loan Documents"). The $5MM Note and a separate Note in the amount of $17, 600,000 executed by Felda Plantation, LLC are secured by a mortgage against property of Felda Plantation, LLC. Debtors' obligations under the above-described notes are guaranteed under limited Guaranty Agreements executed by Franz Rosinus and Scott Westlake (collectively, but excluding the Felda Loan Documents, the "M&I Pre-Petition Loan Documents").

94.     Pursuant to the M&I Pre-Petition Loan Documents, the Lender asserts first priority liens on, and security interests in, substantially all of the Debtors' assets, both tangible and intangible, real and personal, and the proceeds and recoveries of the foregoing (collectively, the "M&I Pre-Petition Collateral"). As such, Lender may assert an interest in the Cash Collateral. As of the Petition Date, the Lender asserts that the Debtors were indebted to the Lender in the amount of approximately $54,434,354.05, plus interest, costs, and attorneys' fees.

95.     An immediate and critical need exists for the Debtors to be permitted to use the Cash Collateral to continue to operate in compliance with the 4 and 13 week budgets attached to the Cash Collateral Motion as Composite Exhibit "A" and in order to, *inter alia,* pay operating

expenses, and generally conduct their business affairs and to maintain their properties so as to avoid immediate and irreparable harm to its estate and the value of their assets.

96.     I am advised that the Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection. *See* 11 U.S.C. § 361. I am further advised that because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. I am further advised that it is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the business of a debtor as a going concern. I am further advised that according to the Eleventh Circuit Court of Appeals:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984). Accordingly, I am advised that courts authorize the use of cash collateral to enhance or preserve the debtor's going concern value.

97.     With respect to adequate protection for the use of cash collateral, I am advised that granting replacement liens provides adequate protection of the secured creditor's interest in cash collateral. In addition to the substantial equity cushion that the Lender has[4], as further adequate protection for the use of Cash Collateral, the Debtors propose to grant to Lender, in accordance with Sections 361 and 363(e) of the Code, adequate protection in the form

---

[4] I understand from counsel that case law, including within the Eleventh Circuit, recognizes that an equity cushion in and of itself can stand as adequate protection.

of (i) a post-petition replacement lien (the "Replacement Lien") on all property that is of the same nature and type as the M&I Pre-Petition Collateral (the "Replacement Collateral") to the extent of the aggregate diminution in value of the M&I Pre-petition Collateral resulting from the post-petition sale, lease, or use of Cash Collateral by the Debtors, subject and subordinate only to the Carveout (defined below) and liens and security interests encumbering the Replacement Collateral that were properly perfected and unavoidable as of the Petition Date; provided, however, the Replacement Collateral shall not include causes of action (or proceeds thereof) held by the Debtors or their bankruptcy estates arising under chapter 5 of the Bankruptcy Code and/or analogous non-bankruptcy law (the "Avoidance Actions"), or the proceeds thereof (the "Avoidance Action Proceeds"), [and (ii) monthly adequate protection payments to the Lender in an amount equal to the applicable non-default, contract rate of interest set forth in the M&I Pre-Petition Loan Documents.[5]

98.     The Debtors propose that the Replacement Lien shall be perfected and enforceable, effective as of the Petition Date, without the necessity of further actions, including the filing of any financing statements, notices, instruments, or other documents with any governmental agency. In its discretion, M&I Bank may file any such financing statements, notices, instruments, other documents, or a certified copy of this Order in any filing or recording office in any jurisdiction in which the Debtors may have real or personal property, and the particular filing or recording officer is authorized and directed to file or record such documents. As used herein, the term "Carveout" means (a) all unpaid compensation and reimbursement of expenses of professionals (including any unpaid holdback amounts) accrued or incurred on or

---

[5] The Debtors reserve the right to value the collateral and, therefore, the amount of the Lender's secured claim pursuant to Section 506 of the Bankruptcy Code, including the right to contest the right of Lender to claim a lien on any post-petition after acquired property.

31

before the Termination Date that are allowed and payable under 11 U.S.C. §§ 330 and 331 and/or any orders of the Court, regardless of whether allowed before such Termination Date; (b) compensation and reimbursement of expenses of professionals accrued or incurred after the Termination Date in connection with the wind-down of the Chapter 11 Cases and conversion to chapter 7 cases, if the cases are converted to chapter 7 cases either voluntarily or involuntarily, in an aggregate amount up to $150,000 that are allowed and payable under 11 U.S.C. §§ 330 and 331 and/or any orders of the Court; and (c) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a).

99.     The Lender will be adequately protected by virtue of the substantial equity cushion and because the Debtors use of Cash Collateral will preserve the value of the properties for the benefit of not only the Debtors but the Lender as well by facilitating the Debtors' financial rehabilitation. It cannot reasonably be disputed that the Debtors' ability to maximize the value of their assets is inextricably tied to maintaining operations on an uninterrupted basis. If the Debtors do not have access to cash, they may be forced to shut down operations. However, with the use of Cash Collateral to conduct the Debtors' business, the Debtors will be able to preserve and protect the value of their assets, including the M&I Pre-Petition Collateral. Therefore, there will be no diminution in value of the M&I Pre-Petition Collateral and the Lender will be adequately protected.

100.    Entry of the Interim Order will minimize disruption of the Debtors' business and operating expenses and permit the Debtors to cover operating expenses necessary to maintain the properties. The use of Cash Collateral sought herein is vital to avoid immediate and irreparable harm to the Debtors' estates.

101. Absent the use of the Cash Collateral, the Debtors' estates would not have the necessary funds to maintain the properties and their operations. Allowing the use of the Cash Collateral, therefore, is in the best interests of the Debtors' estates and the creditors thereof. I believe that the the terms of the proposed use of the cash collateral and adequate protection arrangements are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. Based on the foregoing, I believe that it is appropriate for the Court to grant the Adequate Protection Motion on both an interim and final basis.

## IV. DEBTORS' OBJECTIVES IN THESE CASES

102. The primary purposes of the filing of these Chapter 11 Cases are to (a) restructure the Debtors' finances and emerge from bankruptcy as a viable going-concern, and (b) maximizing the value of the Debtors' assets for all creditors of their estates. The Debtors will strive to restructure their existing debt and equity structure and propose and consummate a Chapter 11 plan of reorganization. In the interim, through the motions described above and other motions and applications the Debtors intend to file shortly after the Petition Date, the Debtors hope to minimize any adverse affects that these Chapter 11 Cases might otherwise have on their business. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

## V. CONCLUSION

103. To successfully reorganize, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these cases by minimizing any adverse impact of the filing of these Chapter 11 cases on the Debtors' assets and operations and protect the interests of the creditors and parties in interest. For the reasons described herein and in the First Day Motions, I

believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 29th day of July, 2011

_____

Scott Westlake

3743845-5