UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

OLD CORKSCREW PLANTATION, LLC, *et al.*,[1]

Debtors.
_____________________________________/

Case No. _______________
Chapter 11 Cases
(Joint Administration Pending)

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION**

Old Corkscrew Plantation, LLC, Old Corkscrew Plantation II, LLC, Old Corkscrew Plantation III, LLC, Old Corkscrew Plantation IV, LLC, Old Corkscrew Plantation V, LLC and Old Corkscrew Plantation VI, LLC (collectively, the "Debtors"), by and through proposed undersigned counsel, pursuant to Administrative Order FLMB-2009-1(C)(1), 11 U.S.C. § 363(c) and Rule 4001(b), Fed. R. Bankr. P., moves for the entry of interim and final orders authorizing the use the Cash Collateral of M&I Marsall & Ilsley Bank ("M&I Bank" or the "Lender"). In support of the Motion, the Debtors rely upon the *Declaration in Support of First Day Pleadings* submitted by Scott Westlake (the "First Day Declaration") filed contemporaneously herewith, and respectfully represent as follows:

[1] The address of each of the Debtors is 22500 State Road 82, Fort Myers, FL 33913; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Old Corkscrew Plantation, LLC (0851); (ii) Old Corkscrew Plantation II, LLC (5121); (iii) Old Corkscrew Plantation III, LLC (3909); (iv) Old Corkscrew Plantation IV, LLC (3911); (v) Old Corkscrew Plantation V, LLC (1515); and (vi) Old Corkscrew Plantation VI, LLC (9990).

## I. Jurisdiction

1. This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. § 1408.

## II. Background

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

3. The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. The Debtors own approximately 5,625 acres of real property in Estero, Florida, approximately 4,622 acres of which are under cultivation as citrus groves. The groves are income producing. 15% of the Debtors revenues are derived from citrus picked to be sold as fruit in the grocery store. 85% of the Debtors' revenue is from fruit picked and sent to be processed as juice. Currently, the Debtors groves account for 1.2% of Florida's total citrus production.

5. For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties-in-interest to the First Day Declaration.

## III. Relief Requested

6. By this Motion, the Debtors seek the entry of an interim Order (the "Interim Order") authorizing, on an emergency and limited basis, use of "Cash Collateral" (as that term is defined in Section 363(a) of the Bankruptcy Code).

7. An immediate and critical need exists for the Debtors to be permitted access to Cash Collateral to continue to operate. Therefore, the Debtors seek an emergency preliminary hearing (the "Preliminary Hearing") in accordance with Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"). At the Preliminary Hearing, the Debtors will seek entry of an Interim Order.

8. By this Motion, the Debtors further seek a final hearing (the "Final Hearing") on this Motion, to be held no less than fifteen (15) days from service of a notice of hearing on such Final Hearing, in accordance with Bankruptcy Rule 4001(b)(2) and (3).

## IV. Pre-Petition Loan Documents

9. Debtors are indebted to M&I Bank under three promissory notes in the original principal amounts of $40,000,000.00, $20,000,000.00 and $5,000,000, evidenced by the following promissory notes:

(a) Amended and Restated Term Note dated August 1, 2006 in the original principal amount of $40,000,000.00 in favor of M&I Bank amended by the First Modification to Promissory Note dated as of December 31, 2009 (the "40MM Note");

(b) Term Note dated August 1, 2006 in the original principal amount of $20,000,000.00 in favor of M&I Bank amended by the First Modification to Promissory Note dated January 25, 2008 and the Second Modification to Promissory Note dated as of December 31, 2009 (the "20MM Note");

(c) Amended and Restated Promissory Note dated October 28, 2008 in the original principal amount of $5,000,000.00 in favor of M&I Bank amended by the First Modification to Promissory Note dated December 31, 2009 (the "5MM Note").

10. As of May 26, 2011, the unpaid balance on the 40MM Note was $33,434,354.05; the unpaid balance on the 40MM Note was $16,000,000; and the unpaid balance on the 5MM Note was $5,000,000.

11. In connection with the Loans evidenced by the $40MM Note and the $20MM Note, Debtors executed a Loan Agreement dated August 1, 2006.

12. The $40MM Note, the $20MM Note and the $5MM Note are secured by (i) an Amended and Restated Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by Old Corkscrew Plantation, LLC; Old Corkscrew Plantation II, LLC; Old Corkscrew Plantation III, LLC; Old Corkscrew Plantation IV, LLC and Old Corkscrew Plantation V, LLC in favor of the Lender; and (ii) a Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by Old Corkscrew Plantation VI, LLC and Felda Plantation, LLC in favor of Lender (the "Felda Loan Documents"). The $5MM Note and a separate Note in the amount of $17, 600,000 executed by Felda Plantation, LLC are secured by a mortgage against property of Felda Plantation, LLC. Debtors' obligations under the above-described notes are guaranteed under limited Guaranty Agreements executed by Franz Rosinus and Scott Westlake (collectively, but excluding the Felda Loan Documents, the "M&I Pre-Petition Loan Documents").

13. Pursuant to them M&I Pre-Petition Loan Documents, the Lender asserts first priority liens on, and security interests in, substantially all of the Debtors' assets, both tangible and intangible, real and personal, and the proceeds and recoveries of the foregoing (collectively, the "M&I Pre-Petition Collateral"). As such, Lender may assert an interest in the Cash Collateral.

14. As of the Petition Date, the Lender asserts that the Debtors were indebted to the Lender in the amount of approximately $54,434,354.05, plus interest, costs, and attorneys' fees.[2] Attached hereto as Composite Exhibit "A" are cover letters/summaries of appraisals of the Debtors' properties conducted by Agri-Property Consultants, Inc. as of May, 2009 which, on a combined basis, reflect that the value of the properties is approximately $103 million, which figure exceeds the total debt claimed by M&I (approximately $54 million) creating an equity cushion in favor of M&I of approximately $49 million or slightly less than 100%.

## V. Basis for Relief

15. An immediate and critical need exists for the Debtors to be permitted to use the Cash Collateral to continue to operate in compliance with the 4 and 13 week budgets attached hereto as Composite Exhibit "B" and incorporated herein and in order to, *inter alia*, pay operating expenses, and generally conduct their business affairs and to maintain their properties so as to avoid immediate and irreparable harm to its estate and the value of their assets.

16. The Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection. *See* 11 U.S.C. § 361. Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. *In re Swedeland Dev. Group Inc.,* 16 F.3d 552, 564 (3d Cir. 1994) (*citing In re O'Connor,* 808 F.2d 1393, 1396-97 (10th Cir. 1987)); *In re Senior Care Properties, Inc.,* 137 B.R. 527, 528 (Bankr. N.D. Fla. 1992) (same).

[2] The Debtors reserve the right to contest the indebtedness and object to any claim filed by the Lender in any of the Debtors' Chapter 11 Cases.

17. Case law, including within this circuit, recognizes that an equity cushion in and of itself can stand as adequate protection. *See*, *e.g.*, *Acquisition Corp. of America v. Federal Savings & Loan Ins. Corp.*, 96 B.R. 380, 383 n.8 (S.D. Fla. 1988) ("It has been held that an equity cushion in and of itself is legally sufficient to satisfy the adequate protection requirement of § 361 and would prevent the lifting of the automatic stay.") (citing *St. Petersburg Federal Savings and Loan Association v. Vincent*, 7 B.R. 866, 869 (M.D. Fla. 1980)); *In re Hefty*, Case Nos. 11-60039 and 11-60040, 2011 WL 2470686, *14 (Bankr. D. Mont. June 20, 2011) (finding that an equity cushion of 38% constitutes adequate protection).

18. It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the business of a debtor as a going concern. According to the Eleventh Circuit:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984).

19. Accordingly, courts authorize the use of cash collateral to enhance or preserve the debtor's going concern value. For example, in *In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." *See also Federal Nat. Mort. v. Dacon Bolingbrook Assocs.,* 153 B.R. 204, 214 (N.D. Ill. 1993)

(security interest protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Constable Plaza Assoc.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"); *In re Dynaco Corp.,* 162 B.R. 389, 395-96 (Bankr. D.N.H. 1993) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on postpetition property acquired by debtor; debtors can use cash collateral "in the normal operation of their business").

20. With respect to adequate protection for the use of cash collateral, granting replacement liens provides adequate protection of the secured creditor's interest in cash collateral. *See, e.g., In re O'Connor,* 808 F.2d at 1397. Moreover, adequate protection exists and is sufficient to the extent that cash collateral is reinvested in and used to maintain and operate the collateral. *See Dacon Bolingbrook Assoc.,* 153 B.R at 214; *In re 499 W. Warren Street Assocs,* 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) ("A secured creditor's interest in the collateral itself is adequately protected when a portion of the rents are applied to its operation and maintenance.").

21. In addition to the substantial equity cushion that the Lender has, as further adequate protection for the use of Cash Collateral, the Debtors propose to grant to Lender, in accordance with Sections 361 and 363(e) of the Bankruptcy Code, adequate protection in the form of (i) a post-petition replacement lien (the "Replacement Lien") on

all property that is of the same nature and type as the M&I Pre-Petition Collateral (the "Replacement Collateral") to the extent of the aggregate diminution in value of the M&I Pre-petition Collateral resulting from the post-petition sale, lease, or use of Cash Collateral by the Debtors, subject and subordinate only to the Carveout (as defined below) and liens and security interests encumbering the Replacement Collateral that were properly perfected and unavoidable as of the Petition Date; provided, however, the Replacement Collateral shall not include causes of action (or proceeds thereof) held by the Debtors or their bankruptcy estates arising under chapter 5 of the Bankruptcy Code and/or analogous non-bankruptcy law (the "Avoidance Actions"), or the proceeds thereof (the "Avoidance Action Proceeds"), and (ii) monthly adequate protection payments to the Lender in an amount equal to the applicable non-default, contract rate of interest set forth in the M&I Pre-Petition Loan Documents.[3]

22. The Replacement Lien shall be perfected and enforceable, effective as of the Petition Date, without the necessity of further actions, including the filing of any financing statements, notices, instruments, or other documents with any governmental agency. In its discretion, M&I Bank may file any such financing statements, notices, instruments, other documents, or a certified copy of this Order in any filing or recording office in any jurisdiction in which the Debtors may have real or personal property, and the particular filing or recording officer is authorized and directed to file or record such documents.

[3] The Debtors have reserved the right to value the collateral and, therefore, the amount of the Lender's secured claim pursuant to Section 506 of the Bankruptcy Code, including the right to contest the right of Lender to claim a lien on any post-petition after acquired property.

23. As used in this Motion, the term "Carveout" means (a) all unpaid compensation and reimbursement of expenses of professionals (including any unpaid holdback amounts) accrued or incurred on or before the earlier of (x) entry of an order terminating the Debtors' use of cash collateral, or (y) the date of the final hearing on the Motion, unless otherwise extended by order of the Court or in writing by M&I Bank (such earlier date, the "Termination Date") that are allowed and payable under 11 U.S.C. §§ 330 and 331 and/or any orders of the Court, regardless of whether allowed before such Termination Date; (b) compensation and reimbursement of expenses of professionals accrued or incurred after the Termination Date in connection with the wind-down of the Chapter 11 Cases and conversion to chapter 7 cases, if the cases are converted to chapter 7 cases either voluntarily or involuntarily, in an aggregate amount up to $150,000 that are allowed and payable under 11 U.S.C. §§ 330 and 331 and/or any orders of the Court; and (c) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a).

24. The Lender will be adequately protected by virtue of the substantial equity cushion and because the Debtors' use of Cash Collateral will preserve the value of the properties for the benefit of not only the Debtors but the Lender as well by facilitating the Debtors' financial rehabilitation. It cannot reasonably be disputed that the Debtors' ability to maximize the value of their assets is inextricably tied to maintaining operations on an uninterrupted basis. If the Debtors do not have access to cash, they may be forced to shut down operations. However, with the use of Cash Collateral to conduct the Debtors' business, the Debtors will be able to preserve and protect the value of their

assets, including the M&I Pre-Petition Collateral. Therefore, there will be no diminution in value of the M&I Pre-Petition Collateral and the Lender will be adequately protected.

25. Entry of the Interim Order will minimize disruption of the Debtors' businesses and operating expenses and permit the Debtors to cover operating expenses necessary to maintain the properties. The use of Cash Collateral sought herein is vital to avoid immediate and irreparable harm to the Debtors' estates.

26. Absent the use of the Cash Collateral, the Debtors' estates would not have the necessary funds to maintain the properties and their operations. Allowing the use of the Cash Collateral, therefore, is in the best interests of the Debtors' estates and the creditors thereof.

27. The terms of the proposed use of the cash collateral and adequate protection arrangements are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

## VI. Notice of Final Hearing

28. Upon entry of the Interim Order, the Debtors will serve, by overnight delivery, telecopy or electronic mail, a copy of the Interim Order on those parties identified on the Master Service List including the creditors holding the 20 largest unsecured claims of each Debtor, M&I Bank, counsel for M&I Bank, the Office of the United States Trustee and any other entities that the Court may direct.

**WHEREFORE**, the Debtors respectfully request that the Court: (i) grant this motion; (ii) enter the Interim Order in the form attached hereto as Exhibit "C" authorizing the use of M&I Bank's Cash Collateral on the terms set forth in the budgets attached hereto on an interim basis (iii) schedule a final hearing on this motion; and (iv) grant such other and further relief as the Court deems just and proper.

Dated: July 29, 2011

Respectfully submitted,

BERGER SINGERMAN, P.A.
200 S. Biscayne Boulevard, 10th Floor
Miami, FL 33131
Telephone (305) 755-9500
Facsimile (305) 714-4340

By: _/s/ Paul Steven Singerman_
Paul Steven Singerman
Florida Bar No. 378860
singerman@bergersingerman.com
Debi Galler
Florida Bar No. 985236
dgaller@bergersingerman.com
Paul A. Avron
Florida Bar No. 0050814
pavron@bergersingerman.com

and

Donald G. Scott
dscott@mcdowellrice.com
McDOWELL RICE SMITH & BUCHANAN, PC
605 W. 47TH Street, Suite 350
Kansas City, MO 64112
Telephone (816) 753-5400
Facsimile (816) 753-9996

*Proposed Co-Counsel to Debtors*

COMPOSITE EXHIBIT “A”
(Budgets)

# OCP I - VI, LLC
## Cash Flow - Including Loan Interest
## 4 Week Budget

| | 7/31/11 - 8/6/11 | 8/7/11 - 8/13/11 | 8/14/11 - 8/20/11 | 8/21/11 - 8/27/11 | Total |
|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ 838,307 | $ 486,161 | $ 415,739 | $ 312,939 | $ 838,307 |
| | | | | | |
| **Income** | | | | | |
| Contracted Fruit and Juice | | | | | |
| Earlies and Mids | | | | | $ - |
| Lates | | | | | $ - |
| Fresh Fruit | | | | | $ - |
| Grapefruit | | | | | $ - |
| Earlies and Mids Rise Payment | | | | | $ - |
| Lates Rise Payment | | | | | $ - |
| Total Contracted Fruit and Juice | $ - | $ - | $ - | $ - | $ - |
| Patronage Dividend Income | $ - | $ - | $ - | $ - | $ - |
| Total Income | $ - | $ - | $ - | $ - | $ - |
| Cost of Goods Sold | | $ (66,528) | | | $ (66,528) |
| Gross Profit | $ - | $ 66,528 | $ - | $ - | $ 66,528 |
| | | | | | |
| **Operating Expenses** | | | | | |
| Grove Management and Labor | $ 40,000 | $ 35,500 | $ 35,500 | $ 35,500 | $ 146,500 |
| Production Chemicals | $ 20,000 | $ 35,000 | $ 20,000 | $ 22,000 | $ 97,000 |
| Grove Maintenance | $ 60,000 | $ 10,000 | $ 22,000 | $ 15,000 | $ 107,000 |
| Facilities and Real Estate | $ 27,100 | $ 12,700 | $ - | $ 1,100 | $ 40,900 |
| General and Administrative | $ - | $ 750 | $ 300 | $ - | $ 1,050 |
| Insurance | $ - | $ - | $ - | $ - | $ - |
| Taxes | $ - | $ - | $ - | $ - | $ - |
| Professional Fees (See Note 1) | $ - | $ 43,000 | $ 25,000 | $ 25,000 | $ 93,000 |
| Total Operating Expenses | $ 147,100 | $ 136,950 | $ 102,800 | $ 98,600 | $ 485,450 |
| | | | | | |
| **Other Expenses** | | | | | |
| Fixed Asset Purchases | $ - | $ - | $ - | $ - | $ - |
| Interest Expense | $ 205,046 | $ - | $ - | $ - | $ 205,046 |
| Mining Initiative | $ - | $ - | $ - | $ - | $ - |
| Total Other Expenses | $ 205,046 | $ - | $ - | $ - | $ 205,046 |
| | | | | | |
| **Ending Cash Balance** | **$ 486,161** | **$ 415,739** | **$ 312,939** | **$ 214,339** | **$ 214,339** |

**Note 1: Breakdown of Professional Fees**

| | July '11 | August '11 |
|---|---|---|
| Arcadia Citrus (Grove Security) | $ 7,400 | $ 7,400 |
| Berger Singerman | Retainer | Retainer |
| Bankruptcy Committee | $ - | $ 50,000 |
| Kapila & Company | Retainer | $ 100,000 |
| McDowell, Rice, Smith & Buchanan | Retainer | Retainer |
| Spectrum Business Ventures | $ 10,600 | $ 10,600 |
| **Total** | **$ 18,000** | **$ 168,000** |

# OCP I - VI, LLC
## Cash Flow - Including Loan Interest
## 13 Week Budget

| | 7/31/11 - 8/6/11 | 8/7/11 - 8/13/11 | 8/14/11 - 8/20/11 | 8/21/11 - 8/27/11 | 8/28/11 - 9/3/11 | 9/4/11 - 9/10/11 | 9/11/11 - 9/17/11 | 9/18/11 - 9/24/11 | 9/25/11 - 10/1/11 | 10/2/11 - 10/8/11 | 10/9/11 - 10/15/11 | 10/16/11 - 10/22/11 | 10/23/11-10/31/11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $ 838,307 | $ 486,161 | $ 415,739 | $ 312,939 | $ 214,339 | $ (202,208) | $ (311,908) | $ 133,526 | $ 23,266 | $ (458,280) | $ (560,010) | $ (662,260) | $ (744,160) | $ 838,307 |
| **Income** | | | | | | | | | | | | | | |
| Contracted Fruit and Juice | | | | | | | | | | | | | | |
| Earlies and Mids | | | | | | | | | | | | | | $ - |
| Lates | | | | | | | | | | | | | | $ - |
| Fresh Fruit | | | | | | | | | | | | | | $ - |
| Grapefruit | | | | | | | | | | | | | | $ - |
| Earlies and Mids Rise Payment | | | | | | | | | | | | | | $ - |
| Lates Rise Payment | | | | | | | $ 584,239 | | | | | | | $ 584,239 |
| Total Contracted Fruit and Juice | $ - | $ - | $ - | $ - | $ - | $ - | $ 584,239 | $ - | $ - | $ - | $ - | $ - | $ - | $ 584,239 |
| Patronage Dividend Income | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 110,000 | $ 110,000 |
| Total Income | $ - | $ - | $ - | $ - | $ - | $ - | $ 584,239 | $ - | $ - | $ - | $ - | $ - | $ 110,000 | $ 694,239 |
| Cost of Goods Sold | | $ (66,528) | | | | | | | | | | | | $ (66,528) |
| Gross Profit | $ - | $ 66,528 | $ - | $ - | $ - | $ - | $ 584,239 | $ - | $ - | $ - | $ - | $ - | $ 110,000 | $ 760,767 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Grove Management and Labor | $ 40,000 | $ 35,500 | $ 35,500 | $ 35,500 | $ 46,500 | $ 46,500 | $ 46,500 | $ 46,500 | $ 46,500 | $ 38,500 | $ 38,500 | $ 38,500 | $ 38,500 | $ 533,000 |
| Production Chemicals | $ 20,000 | $ 35,000 | $ 20,000 | $ 22,000 | $ 70,000 | $ 15,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 15,000 | $ 10,000 | $ 12,000 | $ 12,000 | $ 306,000 |
| Grove Maintenance | $ 60,000 | $ 10,000 | $ 22,000 | $ 15,000 | $ 20,000 | $ 15,000 | $ 20,000 | $ 12,360 | $ 30,000 | $ 10,000 | $ 10,000 | $ 5,000 | $ 10,000 | $ 239,360 |
| Facilities and Real Estate | $ 27,100 | $ 12,700 | $ - | $ 1,100 | | $ 8,200 | | $ 1,100 | $ - | $ 6,000 | $ - | $ 1,100 | $ - | $ 57,300 |
| General and Administrative | $ - | $ 750 | $ 300 | $ - | $ - | $ - | $ 750 | $ 300 | $ - | $ - | $ 750 | $ 300 | $ - | $ 3,150 |
| Insurance | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,556 | $ - | $ - | $ 7,230 | $ - | $ - | $ - | $ 10,786 |
| Taxes | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Professional Fees (See Note 1) | $ - | $ 43,000 | $ 25,000 | $ 25,000 | $ 75,000 | $ 25,000 | $ 43,000 | $ 25,000 | $ 175,000 | $ 25,000 | $ 43,000 | $ 25,000 | $ 175,000 | $ 704,000 |
| Total Operating Expenses | $ 147,100 | $ 136,950 | $ 102,800 | $ 98,600 | $ 211,500 | $ 109,700 | $ 138,806 | $ 110,260 | $ 276,500 | $ 101,730 | $ 102,250 | $ 81,900 | $ 235,500 | $ 1,853,596 |
| **Other Expenses** | | | | | | | | | | | | | | |
| Fixed Asset Purchases | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest Expense | $ 205,046 | $ - | $ - | $ - | $ 205,046 | $ - | $ - | $ - | $ 205,046 | $ - | $ - | $ - | $ - | $ 615,139 |
| Mining Initiative | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Other Expenses | $ 205,046 | $ - | $ - | $ - | $ 205,046 | $ - | $ - | $ - | $ 205,046 | $ - | $ - | $ - | $ - | $ 615,139 |
| **Ending Cash Balance** | **$ 486,161** | **$ 415,739** | **$ 312,939** | **$ 214,339** | **$ (202,208)** | **$ (311,908)** | **$ 133,526** | **$ 23,266** | **$ (458,280)** | **$ (560,010)** | **$ (662,260)** | **$ (744,160)** | **$ (869,660)** | **$ (869,660)** |

**Note 1: Breakdown of Professional Fees**

| | July '11 | August '11 | September '11 | October '11 |
|---|---|---|---|---|
| Arcadia Citrus (Grove Security) | $ 7,400 | $ 7,400 | $ 7,400 | $ 7,400 |
| Berger Singerman | Retainer | Retainer | $ 125,000 | $ 125,000 |
| Bankruptcy Committee | $ - | $ 50,000 | $ 25,000 | $ 25,000 |
| Kapila & Company | Retainer | $ 100,000 | $ 100,000 | $ 100,000 |
| McDowell, Rice, Smith & Buchanan | Retainer | Retainer | Retainer | Retainer |
| Spectrum Business Ventures | $ 10,600 | $ 10,600 | $ 10,600 | $ 10,600 |
| **Total** | **$ 18,000** | **$ 168,000** | **$ 268,000** | **$ 268,000** |

# COMPOSITE EXHIBIT "B"
(Appraisals)

May 13, 2009

M&I (Marshall & Ilsley) Bank
11301 Nall Avenue
Leawood, Kansas 66211

Attn: Daniel Collins, Vice President

Re: Old Corkscrew Plantation I, LLC
Tropic/Winner Citrus Grove ±1,270 Acres
Lee County, Florida
File No: 09-108A

Dear Mr. Collins:

As you requested, I have completed an appraisal of the above-referenced subject property. This property is legally and physically described within the body of the attached self- contained, appraisal report intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. I have appraised many similar properties and have the knowledge necessary to provide you with a value estimate.

The purpose of this appraisal is to estimate the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009. My value conclusion is sensitive to the legal and permissible uses to which the subject property is bound, as well as the physical attributes it is perceived to possess.

In my opinion, you will find that, after careful and complete consideration of all the available facts and data, it is my opinion that the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009, was:

TWENTY FOUR MILLION DOLLARS ..............................................................................($24,000,000).

The basis for this conclusion is explained in detail in the contents of the appraisal report that is to be forwarded to you. Reference is made to the following Assumptions and Limiting Conditions which are described in detail on Page 8 as well as the Specific Conditions and Assumptions located on Page 9 within said report.

Respectfully submitted,

AGRI-PROPERTY CONSULTANTS, INC.

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified General Appraiser RZ376

Attachment

SUMMARY OF FACTS AND CONCLUSIONS

LOCATION: The property is located on the south side of Corkscrew Road, approximately 11 miles east of I-75, Lee County, Florida.

SIZE: The site consists of a total land area of approximately 1,270 acres.

IMPROVEMENTS: The property is improved with a mature producing citrus grove. The east ±670 acres (Tropic Grove) was planted with approximately 320 acres of Hamlin and Pineapple oranges on Sour Orange rootstock in 1985, 220 acres of Valencia oranges on Carrizo rootstock in 1985, and approximately 90 acres of Valencia oranges on Carrizo rootstock planted in 1990. This property is also improved with four buildings, including a mobile home, small office area, shop, machine shed area, and chemical storage building.

The west 600 acres (Winter Grove) were planted in early 1988 and its approximately 58% Valencia oranges and 42% Hamlin oranges. Approximately 75% of the Hamlin oranges were on Carrizo rootstock with the remaining 25% on Sour orange rootstock. Nearly 90% of the Valencia oranges were planted on Carrizo rootstock with the remainder on Swingle rootstock. Approximately 60 acres of this site is a diked retention area. The grove has multiple wells and low volume irrigation systems.

| | |
|---|---|
| ZONING/FUTURE LAND USE: | The property is reportedly zoned AG-2 (Agricultural). It is also classified as "Density Reduction/Ground Water Resource" under the Comprehensive Land Use Plan. |
| HIGHEST AND BEST USE: | Vacant – Interim agricultural use while holding for future development.<br>Improved – Interim use as citrus grove while holding for future development. |
| MARKET VALUE ESTIMATE: | $24,000,000 |
| DATE OF APPRAISAL: | May 6, 2009 |
| DATE OF REPORT: | May 13, 2009 |
| APPRAISERS: | AGRI-PROPERTY CONSULTANTS, INC. |

May 13, 2009

M&I (Marshall & Ilsley) Bank
11301 Nall Avenue
Leawood, Kansas 66211

Attn: Daniel J. Collins, Vice President/Regional Review Appraiser

Re: Old Corkscrew Plantation II, LLC
Corkscrew Road
±640 Acres
Lee County, Florida
File No: 09-108D

Dear Mr. Collins:

As you requested, I have completed an appraisal of the above-referenced subject property. This property is legally and physically described within the body of the attached self- contained, appraisal report intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. I have appraised many similar properties and have the knowledge necessary to provide you with a value estimate.

The purpose of this appraisal is to estimate the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009. My value conclusion is sensitive to the legal and permissible uses to which the subject property is bound, as well as the physical attributes it is perceived to possess.

In my opinion, you will find that, after careful and complete consideration of all the available facts and data, it is my opinion that the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009, was:

FOURTEEN MILLION ONE HUNDRED THOUSAND DOLLARS ............................................($14,100,000).

The basis for this conclusion is explained in detail in the contents of the appraisal report that is to be forwarded to you. Reference is made to the following Assumptions and Limiting Conditions which are described in detail on Page 8 as well as the Specific Conditions and Assumptions located on Page 9 within said report.

Respectfully submitted,

AGRI-PROPERTY CONSULTANTS, INC.

Clifford M. Bowen, Jr.

Digitally signed by Clifford M. Bowen, Jr.
DN: cn=Clifford M. Bowen, Jr., o, ou, email=cliffbowen@gulfaccess.net, c=US
Date: 2009.05.15 16:57:02 -04'00'

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified General Appraiser RZ376

Attachment

## SUMMARY OF FACTS AND CONCLUSIONS

LOCATION: The property is located on the north side of Corkscrew Road at its eastern terminus, approximately 12 miles east of I-75. This location is approximately 9 miles west of Immokalee and 5.5 miles south of SR 82 in Lee County, Florida.

SIZE: The property contains a total land area of approximately 640 gross acres, 616 grove acres and 470 net tree acres.

IMPROVEMENTS: The property was first improved as a citrus grove approximately 30 years ago. Approximately ¾ of the property was set with round oranges and the remaining ¼ with White Marsh seedless grapefruit. Since that time, the orange blocks have been heavily reset and have a number of 12 to 13 year old trees that are in their prime years. The grapefruit block was pushed and replanted with Valencia oranges in late 1998 and early 1999. These trees are just reaching peak productive years. At this time, there are approximately 41,100 Valencia trees on 276.9 net tree acres, and 29,300 Hamlin and Pineapple orange trees on approximately 193 net tree acres.

ZONING/LAND USE: The property is reportedly zoned AG-2 (Agricultural/Density Reduction Ground Water Resource) with one dwelling unit per 10 acres.

| | |
|---|---|
| HIGHEST & BEST USE: | As Vacant - Interim agricultural use while holding for future development.<br>As Improved - Interim use as citrus grove while holding for future development. |
| PROPERTY RIGHTS APPRAISED: | Fee Simple Ownership - Subject to easements and reservations of oil, gas and mineral rights of record. |
| MARKET VALUE ESTIMATE: | $14,100,000 |
| DATE OF APPRAISAL: | May 6, 2009 |
| DATE OF REPORT: | May 13, 2009 |
| APPRAISERS: | AGRI-PROPERTY CONSULTANTS, INC. |

May 13, 2009

M&I (Marshall & Ilsley) Bank
11301 Nall Avenue
Leawood, Kansas 66211

Attn: Daniel J. Collins, Vice President/Regional Review Appraiser

Re: Old Corkscrew Plantation III, LLC
±311 Acres
Lee County, Florida
File No: 09-108B

Dear Mr. Collins:

As you requested, I have completed an appraisal of the above-referenced subject property. This property is legally and physically described within the body of the attached self- contained, appraisal report intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. I have appraised many similar properties and have the knowledge necessary to provide you with a value estimate.

The purpose of this appraisal is to estimate the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009. My value conclusion is sensitive to the legal and permissible uses to which the subject property is bound, as well as the physical attributes it is perceived to possess.

In my opinion, you will find that, after careful and complete consideration of all the available facts and data, it is my opinion that the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009, was:

FOUR MILLION EIGHT HUNDRED FIFTY THOUSAND DOLLARS ........................................(\$4,850,000).

The basis for this conclusion is explained in detail in the contents of the appraisal report that is to be forwarded to you. Reference is made to the following Assumptions and Limiting Conditions which are described in detail on Page 8 as well as the Specific Conditions and Assumptions located on Page 9 within said report.

Respectfully submitted,

AGRI-PROPERTY CONSULTANTS, INC.

Digitally signed by Clifford M. Bowen, Jr.
DN: cn=Clifford M. Bowen, Jr., o, ou, email=cliffbowen@gulfaccess.net, c=US
Date: 2009.05.15 16:28:23 -04'00'

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified General Appraiser RZ376

Attachment

## SUMMARY OF FACTS AND CONCLUSIONS

LOCATION: The property is located one mile south of Corkscrew Road, approximately 11 miles east of I-75, Lee County, Florida.

SIZE: The site consists of a total land area of approximately 311 acres.

IMPROVEMENTS: The property is improved with a mature producing citrus grove. There are a total of approximately 255.5 net tree acres planted. The remainder is roads, ditches, reservoir and wooded area. There are ±129.1 net acres of Valencias and 126.4 net acres of Early and Mid Season oranges (Hamlins, Pineapples and Midsweets). There are ±8.9 acres of 8-9 year old Midsweets and ±20.7 acres of 5 year old Midsweets on Swingle.

Approximately one-half of the original Hamlin and Pineapple trees were planted on Sour Orange rootstock. Many of these trees have been replaced in recent years. The remainder of the original trees were planted on Rough Lemon rootstock. The resets in these areas are on Carrizo, Swingle, Volkameriana and Benton rootstocks.

There is a drip irrigation system supplied by one well.

ZONING/FUTURE LAND USE: The property is reportedly zoned AG-2 (Agricultural). It is also classified as "Density Reduction/Ground Water Resource" under the Comprehensive Land Use Plan.

| | |
|---|---|
| HIGHEST & BEST USE: | Vacant – Interim agricultural use while holding for future development.<br><br>Improved – Interim use as citrus grove while holding for future development. |
| MARKET VALUE ESTIMATE: | $4,850,000 |
| DATE OF APPRAISAL: | May 6, 2009 |
| DATE OF REPORT: | May 13, 2009 |
| APPRAISERS: | AGRI-PROPERTY CONSULTANTS, INC. |

# Agri-Property Consultants, Inc.

Real Estate Analysis & Consulting

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified Gen. Appr. 0000376


May 13, 2009

M&I (Marshall & Ilsley) Bank
11301 Nall Avenue
Leawood, Kansas 66211

Attn: Daniel J. Collins, Vice President/Regional Review Appraiser

Re: Old Corkscrew Plantation IV, LLC
Citrus Grove/±678.89 Acres
Lee County, Florida
File No: 09-108E

Dear Mr. Collins:

As you requested, I have completed an appraisal of the above-referenced subject property. This property is legally and physically described within the body of the attached self- contained, appraisal report intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. I have appraised many similar properties and have the knowledge necessary to provide you with a value estimate.

The purpose of this appraisal is to estimate the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009. My value conclusion is sensitive to the legal and permissible uses to which the subject property is bound, as well as the physical attributes it is perceived to possess.

In my opinion, you will find that, after careful and complete consideration of all the available facts and data, it is my opinion that the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6. 2009, was:

FOURTEEN MILLION DOLLARS......................................................................................($14,000,000).

The basis for this conclusion is explained in detail in the contents of the appraisal report that is to be forwarded to you. Reference is made to the following Assumptions and Limiting Conditions which are described in detail on Page 8 as well as the Specific Conditions and Assumptions located on Page 9 within said report..

Respectfully submitted,

AGRI-PROPERTY CONSULTANTS, INC.

Clifford M. Bowen, Jr.

Digitally signed by Clifford M. Bowen, Jr.
DN: cn=Clifford M. Bowen, Jr., o, ou, email=cliffbowen@gulfaccess.net, c=US
Date: 2009.05.18 14:27:22 -04'00'

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified General Appraiser RZ376

CMB/cb
Attachment


1919 Courtney Drive • Suite 9 • Fort Myers, Florida 33901
Phone: (239) 936-4041 Ext. 12 • FAX: (239) 936-3141 • e-mail: cliffbowen@gulfaccess.net

## SUMMARY OF FACTS AND CONCLUSIONS

LOCATION: The property is located one mile north and one mile west of CR 850 where it changes from an east/west roadway to a north/south roadway at the Lee/Collier County line, Lee County, Florida. This is approximately 11 miles east of I-75.

ACCESS: Access to the subject property is via an unpaved easement roadway.

SIZE: The site contains of a total land area of approximately 678.89 acres.

IMPROVEMENTS: The property is improved with a producing citrus grove. There are approximately 394 net tree acres planted. The remainder is roads, ditches, reservoir, wetlands and wooded area.

There are ±235.5 net acres of Valencias, of which 206.4 net acres are mature trees and 29.1 are two to four year old trees that are just now beginning to produce. There are 68.2 net acres of Early and Mid Season varieties that are mature. There are 55.2 net acres of Deep Red Ray grapefruit and 31.1 net acres of Ruby Red grapefruit for a total of 90.3 net acres of Red grapefruit. The grapefruit, Hamlin oranges and the majority of the Valencia oranges are on Swingle rootstock with the remainder of the Valencia oranges being on Carrizo rootstock and the Pineapple oranges on Cleo rootstock. The usable improved land on which the citrus is planted encompasses a total of approximately 515 acres.

| | |
|---|---|
| | There is a low-volume jet irrigation system supplied by wells. |
| ZONING/FUTURE LAND USE: | The property is reportedly zoned AG-2 (Agricultural). It is also classified as "Density Reduction/Ground Water Resource" under the Comprehensive Land Use Plan. |
| HIGHEST AND BEST USE: | Vacant – Interim agricultural use while holding for future development.<br>Improved – Interim use as citrus grove while holding for future development. |
| MARKET VALUE ESTIMATE: | $14,000,000 |
| DATE OF APPRAISAL: | May 6, 2009 |
| DATE OF REPORT: | May 13, 2009 |
| APPRAISERS: | AGRI-PROPERTY CONSULTANTS, INC. |

Agri-Property Consultants, Inc.

Real Estate Analysis & Consulting

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified Gen. Appr. 0000376

May 17, 2009

M&I (Marshall & Ilsley) Bank
11301 Nall Avenue
Leawood, Kansas 66211

Attn: Daniel Collins, Vice President

Re: Old Corkscrew Plantation V, LLC
Citrus Grove
±1,934.22 Grove Acres/±2,475.41 Gross Acres
Lee County, Florida
File No: 09-108F

Dear Mr. Collins:

As you requested, I have completed an appraisal of the above-referenced subject property. This property is legally and physically described within the body of the attached self- contained, appraisal report intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. I have appraised many similar properties and have the knowledge necessary to provide you with a value estimate.

The purpose of this appraisal is to estimate the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009. My value conclusion is sensitive to the legal and permissible uses to which the subject property is bound, as well as the physical attributes it is perceived to possess.

In my opinion, you will find that, after careful and complete consideration of all the available facts and data, it is my opinion that the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009, was:

FORTY TWO MILLION SIX HUNDRED DOLLARS ................................................................($42,600,000).

The basis for this conclusion is explained in detail in the contents of the appraisal report that is to be forwarded to you. Reference is made to the following Assumptions and Limiting Conditions which are described in detail on Page 8 as well as the Specific Conditions and Assumptions located on Page 9 within said report.

Respectfully submitted,

AGRI-PROPERTY CONSULTANTS, INC.

Clifford M. Bowen, Jr.

Digitally signed by Clifford M. Bowen, Jr.
DN: cn=Clifford M. Bowen, Jr., o, ou, email=cliffbowen@gulfaccess.net, c=US
Date: 2009.05.18 15:21:50 -04'00'

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified General Appraiser RZ376

CMB/cb
Attachment

1919 Courtney Drive • Suite 9 • Fort Myers, Florida 33901
Phone: (239) 936-4041 Ext. 12 • FAX: (239) 936-3141 • e-mail: cliffbowen@gulfaccess.net

SUMMARY OF FACTS AND CONCLUSIONS

LOCATION: The property is located on the south side of SR 82, approximately one mile west of the East Lee County line in Lee County, Florida..

SIZE: According to a survey utilized by the property owner, there are approximately 1,934.22 deeded acres outside of diked wetland and retention areas. These wetland and retention areas comprise an additional area estimated to be 1,049 acres. Ownership of the wetland and retention areas is divided between Old Corkscrew Plantation V and other owners known collectively as the "Hunt Group". The use of the retention area is shared by the ownerships. The wetland-retention area deeded to the subject ownership is 541.19. For the purposes of this appraisal, we are basing the value conclusions on the 1,934.22 grove acres that are deeded to the Old Corkscrew Plantation V ownership, in fee simple, subject to easements and reservations of record.

EASEMENTS & ENCROACHMENTS: There are easements for access over and across roadways on the subject property and easement agreements for drainage, retention and certain common irrigation wells. In addition, there are utility easements and reservations of oil, gas and mineral rights. The easements do not appear to be detrimental as these agreements work to the benefit of the Old Corkscrew Plantation V ownership as well as the "Hunt Group" ownership in operating and maintaining the existing citrus groves on the properties. The utility easements and the reservation of oil, gas and mineral rights are

typical of other similar properties in the area and are not considered detrimental to the value.

IMPROVEMENTS:

The 1,934.22 grove acres have been improved with approximately 1,735.42 net tree acres of various citrus varieties. These varieties include Valencia oranges (161.35 net acres), Rhode Red Valencia oranges (715.17 net acres), Hamlin oranges (119.50 net acres), Mid-Sweet oranges (249.89 net acres), Navel oranges (29.71 net acres), Ruby Red grapefruit (221.57 net acres), Flame Red grapefruit (29.46 net acres), Rio Red grapefruit (9.88 net acres), Murcotts (Honey tangerines) (130.82 net acres), and Sunburst tangerines, Fallglo tangerines and Orlando tangelos (68.07 net acres). A majority of the trees are on Swingle or Carrizo rootstock with a small number of trees on Cleo rootstock. A majority of the trees were planted in 1991 and 1992 with the grove now being mature and at peak production.

Irrigation and drainage are adequate. Irrigation is a low volume jet system supplied by numerous wells and pumps. The drainage infrastructure appears to be excellent and well maintained.

There are no significant buildings on the site. There is an office building, steel shop and pole barns. These buildings are typical of those necessary for operating a grove of this type.

ZONING/FUTURE LAND USE:

The property is reportedly zoned AG-2 (Agricultural). It is also classified as "Density Reduction/Ground

| | |
|---|---|
| | Water Resource" under the Comprehensive Land Use Plan. |
| HIGHEST AND BEST USE: | Vacant – Interim agricultural use while holding for future development.<br>Improved – Interim use as citrus grove while holding for future development. |
| MARKET VALUE ESTIMATE: | $42,600,000 |
| DATE OF APPRAISAL: | May 6, 2009 |
| DATE OF REPORT: | May 17, 2009 |
| APPRAISERS: | AGRI-PROPERTY CONSULTANTS, INC. |



May 13, 2009

M&I (Marshall & Ilsley) Bank
11301 Nall Avenue
Leawood, Kansas 66211

Attn: Daniel J. Collins, Vice President/Regional Review Appraiser

Re: Old Corkscrew Plantation VI, LLC
±240 Acres
Lee County, Florida
File No: 09-108C

Dear Mr. Collins:

As you requested, I have completed an appraisal of the above-referenced subject property. This property is legally and physically described within the body of the attached self- contained, appraisal report intended to comply with the reporting requirements set forth under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice. I have appraised many similar properties and have the knowledge necessary to provide you with a value estimate.

The purpose of this appraisal is to estimate the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009. My value conclusion is sensitive to the legal and permissible uses to which the subject property is bound, as well as the physical attributes it is perceived to possess.

In my opinion, you will find that, after careful and complete consideration of all the available facts and data, it is my opinion that the market value of the subject property, in terms of cash and in fee simple ownership, subject to easements and reservations of oil, gas and mineral rights of record, under market conditions existing as of May 6, 2009, was:

THREE MILLION THREE HUNDRED THOUSAND DOLLARS .................................................. ($3,300,000).

The basis for this conclusion is explained in detail in the contents of the appraisal report that is to be forwarded to you. Reference is made to the following Assumptions and Limiting Conditions which are described in detail on Page 8 as well as the Specific Conditions and Assumptions located on Page 9 within said report.

Respectfully submitted,

AGRI-PROPERTY CONSULTANTS, INC.

Clifford M. Bowen, Jr.

Digitally signed by Clifford M. Bowen, Jr.
DN: cn=Clifford M. Bowen, Jr., o, ou, email=cliffbowen@gulfaccess.net, c=US
Date: 2009.05.15 16:25:21 -04'00'

Clifford M. Bowen, Jr., SRA, IFAS
State-Certified General Appraiser RZ376

Attachment

## SUMMARY OF FACTS AND CONCLUSIONS

| | |
|---|---|
| LOCATION: | The property is located one mile south of Corkscrew Road, approximately 11 miles east of I-75, Lee County, Florida. |
| SIZE: | The site consists of a total land area of approximately 240 acres. |
| IMPROVEMENTS: | The property is improved with a mature producing citrus grove. There are a total of 143.18 net tree acres planted. The remainder is roads, ditches, service area and woodland. There are 56.01 net acres of Valencias and 87.17 net acres of Hamlin oranges. A large number of trees are 5 to 8 years old and with proper care should bring increased production to the grove.<br><br>There is a well designed low volume jet irrigation system with water supplied by three wells. |
| ZONING/FUTURE LAND USE: | The property is reportedly zoned AG-2 (Agricultural). It is also classified as "Density Reduction/Ground Water Resource" under the Comprehensive Land Use Plan. |
| HIGHEST & BEST USE: | Vacant – Interim agricultural use while holding for future development.<br><br>Improved – Interim use as citrus grove while holding for future development. |
| MARKET VALUE ESTIMATE: | $3,300,000 |

| | |
|---|---|
| DATE OF APPRAISAL: | May 6, 2009 |
| DATE OF REPORT: | May 13, 2009 |
| APPRAISERS: | AGRI-PROPERTY CONSULTANTS, INC. |

EXHIBIT “C”
(Proposed Interim Order)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

OLD CORKSCREW PLANTATION, LLC, *et al.*,1

Debtors.
________________________________________/

Case No. ________________
Chapter 11 Cases
(Joint Administration Pending)

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, AND (C) SCHEDULING A FINAL HEARING**

**THE MATTER** came before the Court for hearing on August ___, 2011 at ___:___ ___.m. in Ft. Myers, Florida upon the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, and (II) Granting Adequate Protection* (the "Motion") [D.E. ___] filed by Old Corkscrew Plantation, LLC, Old Corkscrew Plantation II, LLC, Old Corkscrew Plantation III, LLC, Old Corkscrew Plantation IV, LLC, Old Corkscrew Plantation V, LLC and Old Corkscrew Plantation VI, LLC (collectively, the "Debtors") through which they seek entry of interim and final orders authorizing the use the Cash Collateral[2] of M&I Bank. The Court finds that proper and adequate notice of the Motion (and the hearing thereon) was given in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the *Administrative Order Establishing Initial Procedures in Chapter 11 Cases Filed in the United States Bankruptcy Court of the Middle District of Florida*, and no other or further notice is necessary. Based on the law and facts contained in the Motion, the evidence presented, the

1 The address of each of the Debtors is 22500 State Road 82, Fort Myers, FL 33913; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Old Corkscrew Plantation, LLC (0851); (ii) Old Corkscrew Plantation II, LLC (5121); (iii) Old Corkscrew Plantation III, LLC (3909); (iv) Old Corkscrew Plantation IV, LLC (3911); (v) Old Corkscrew Plantation V, LLC (1515); and (vi) Old Corkscrew Plantation VI, LLC (9990).

2 All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

arguments of counsel, the stipulations of the Debtors and the entire record herein, good and sufficient cause exists for the granting of the relief requested in the Motion. Accordingly, the Court FINDS that:

**Jurisdiction and Venue**

1. The Court has jurisdiction over these Chapter 11 cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**The Bankruptcy Cases**

2. On July 29, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As part of their first day relief, the Debtors have requested joint administration of their bankruptcy cases for administrative purposes only.

**The Prepetition Credit Facility**

3. Debtors are indebted to M&I Bank under three promissory notes in the original principal amounts of $40,000,000.00, $20,000,000.00 and $5,000,000, evidenced by the following promissory notes:

(a) Amended and Restated Term Note dated August 1, 2006 in the original principal amount of $40,000,000.00 in favor of M&I Bank amended by the First Modification to Promissory Note dated as of December 31, 2009 (the "40MM Note");

(b) Term Note dated August 1, 2006 in the original principal amount of $20,000,000.00 in favor of M&I Bank amended by the First Modification to Promissory

Note dated January 25, 2008 and the Second Modification to Promissory Note dated as of December 31, 2009 (the "20MM Note");

(c) Amended and Restated Promissory Note dated October 28, 2008 in the original principal amount of $5,000,000.00 in favor of M&I Bank amended by the First Modification to Promissory Note dated December 31, 2009 (the "5MM Note").

4. As of May 26, 2011, the unpaid balance on the 40MM Note was $33,434,354.05; the unpaid balance on the 40MM Note was $16,000,000; and the unpaid balance on the 5MM Note was $5,000,000.

5. In connection with the Loans evidenced by the $40MM Note and the $20MM Note, Debtors executed a Loan Agreement dated August 1, 2006.

6. The $40MM Note, the $20MM Note and the $5MM Note are secured by (i) an Amended and Restated Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by Old Corkscrew Plantation, LLC; Old Corkscrew Plantation II, LLC; Old Corkscrew Plantation III, LLC; Old Corkscrew Plantation IV, LLC and Old Corkscrew Plantation V, LLC in favor of the Lender; and (ii) a Real Estate Mortgage, Assignment and Security Agreement dated August 1, 2006, executed by Old Corkscrew Plantation VI, LLC and Felda Plantation, LLC in favor of Lender (the "Felda Loan Documents"). The $5MM Note and a separate Note in the amount of $17, 600,000 executed by Felda Plantation, LLC are secured by a mortgage against property of Felda Plantation, LLC. Debtors' obligations under the above-described notes are guaranteed under limited Guaranty Agreements executed by Franz Rosinus and Scott Westlake (collectively, but excluding the Felda Loan Documents, the "M&I Pre-Petition Loan Documents").

7. Pursuant to them M&I Pre-Petition Loan Documents, the Lender asserts first priority liens on, and security interests in, substantially all of the Debtors' assets, both tangible and intangible, real and personal, and the proceeds and recoveries of the foregoing (collectively, the "M&I Pre-Petition Collateral"). As such, Lender may assert an interest in the Cash Collateral.

8. As of the Petition Date, the Lender asserts that the Debtors were indebted to the Lender in the amount of approximately $54,434,354.05, plus interest, costs, and attorneys' fees. The Debtors assert that, based on appraisals of their properties done in May 2009 that there exists an equity cushion in favor of the Lender of almost 100% of the total amount claimed due and owing by the Lender.

9. All cash and cash equivalents held by the Debtors on the Petition Date and proceeds and revenue generated from the ownership and operation of the M&I Pre-petition Collateral constitute M&I Bank's cash collateral within the meaning of 11 U.S.C. § 363(a).

**The Debtors' Need to Use Cash Collateral**

10. The Debtors do not have access to available sources of financing or unencumbered working capital sufficient to fund their ongoing business expenses and the chapter 11 process, and therefore require the use of cash collateral. Without the use of Cash Collateral, the Debtors cannot meet their ongoing post-petition obligations related to their business operations.

11. The use of Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors' bankruptcy estates, including an irreparable decline in the value of their property and assets to the detriment of the Debtors' creditors.

12. In compliance with section 363(e) of the Bankruptcy Code, M&I Bank's interests are adequately protected by the asserted equity cushion and the other adequate protection granted herein.

13. Good cause has been shown for the entry of this Order. The proposed use of Cash Collateral is of the utmost importance to the preservation of the value of the Debtors' bankruptcy estates and will enhance the Debtors' prospects for confirming a chapter 11 plan. The entry of this Order is in the best interests of the Debtors and their respective bankruptcy estates, creditors, and all parties-in-interest. The terms and conditions of the use of the cash collateral and the proposed adequate protection arrangement are fair and appropriate under the circumstances and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

Based on the foregoing findings of fact and the entire record in these bankruptcy cases, it is therefore **ORDERED** that:

**Authority to Use Cash Collateral**

1. The relief requested in the Motion is granted on an interim basis.

2. The Debtors are authorized to use any and all Cash Collateral in accordance with the 4 week budget attached hereto as Composite Exhibit A (collectively, the "Interim Budget") pending a final hearing on the Motion. The use of Cash Collateral may vary from the amounts identified in the Interim Budget for the period beginning from the Petition Date until and through the Termination Date (defined below) by ten percent (10%) on an aggregate basis. For the avoidance of doubt, amounts identified in the Interim Budget not expended during a particular week shall carry forward to successive weekly periods, and any such carry-over surplus can be expended by the Debtors on any line items included in the Interim Budget, subject to the 10% aggregate variance. In the event M&I Bank consents in writing to the use of Cash Collateral in a

manner or amount that does not conform to the Interim Budget, the Debtors are authorized pursuant to this Order to expend Cash Collateral for such non-conforming use without further court approval, and M&I Bank is entitled to all the protections specified in this Order for any such non-conforming use.

3. The authority for the Debtors to use cash collateral as provided for in this Order shall terminate on the earlier of (a) entry of an order terminating the Debtors' use of cash collateral in accordance with paragraph 10 of this Order, or (b) the date of the final hearing on the Motion, unless otherwise extended by order of the Court or in writing by M&I Bank (such earlier date, the "Termination Date").

**Adequate Protection for the Use of Cash Collateral**

4. Under 11 U.S.C. §§ 361 and 363, M&I Bank is entitled to adequate protection of its interests in the M&I Pre-Petition Collateral, including any such collateral constituting Cash Collateral. In accordance with sections 361 and 363(e) of the Bankruptcy Code, adequate protection shall be in the form of (i) the asserted equity cushion, (ii) a post-petition replacement lien (the “Replacement Lien”) on all property that is of the same nature and type as the M&I Pre-Petition Collateral (the “Replacement Collateral”) to the extent of the aggregate diminution in value of the M&I Pre-Petition Collateral resulting from the post-petition sale, lease, or use of Cash Collateral by the Debtors, subject and subordinate only to the Carveout (defined below) and liens and security interests encumbering the Replacement Collateral that were properly perfected and unavoidable as of the Petition Date; provided, however, the Replacement Collateral shall not include causes of action (or proceeds thereof) held by the Debtors or their bankruptcy estates arising under chapter 5 of the Bankruptcy Code and/or analogous non-bankruptcy law (“Avoidance Actions”), or the proceeds thereof (“Avoidance Action Proceeds”),

and (iii) monthly adequate protection payments to the Lender in an amount equal to the applicable non-default, contract rate of interest set forth in the M&I Pre-Petition Loan Documents.[3]

5. The Replacement Lien shall be perfected and enforceable, effective as of the Petition Date, without the necessity of further actions, including the filing of any financing statements, notices, instruments, or other documents with any governmental agency. In its discretion, M&I Bank may file any such financing statements, notices, instruments, other documents, or a certified copy of this Order in any filing or recording office in any jurisdiction in which the Debtors may have real or personal property, and the particular filing or recording officer is authorized and directed to file or record such documents.

6. As used in this Order, the term "Carveout" means (a) all unpaid compensation and reimbursement of expenses of professionals (including any unpaid holdback amounts) accrued or incurred on or before the Termination Date that are allowed and payable under 11 U.S.C. §§ 330 and 331 and/or any orders of the Court, regardless of whether allowed before such Termination Date; (b) compensation and reimbursement of expenses of professionals accrued or incurred after the Termination Date in connection with the wind-down of the Chapter 11 Cases and conversion to chapter 7 cases, if the cases are converted to chapter 7 cases either voluntarily or involuntarily, in an aggregate amount up to $150,000 that are allowed and payable under 11 U.S.C. §§ 330 and 331 and/or any orders of the Court; and (c) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a).

3 The Debtors have reserved the right to value the collateral beyond the values set forth in the May 2009 appraisals and, therefore, the amount of the Lender's secured claim pursuant to Section 506 of the Bankruptcy Code, including the right to contest the right of Lender to claim a lien on any post-petition after acquired property.

**Final Hearing; Objection Deadline**

7. Pursuant to Fed. R. Bankr. P. 4001, the final hearing on the Motion shall be scheduled be conducted on **August ___, 2011, at ____:____ __.m.** (the "Final Hearing") before the Court at the United States Courthouse, 2110 First Street, Courtroom ____, Fort Myers, Florida 33901.

8. Any party-in-interest objecting or responding to the permanent relief requested in the Motion shall file a written objection or response describing in detail the grounds thereof. Such written objection or response must be filed with the Court and served so as to be actually received **no later than five (5) calendar days before the Final Hearing** on the following parties: (a) the Debtors and their bankruptcy counsel, (b) M&I Bank and its legal counsel, and (c) the Office of the United States Trustee for the Middle District of Florida.

**Miscellaneous**

9. The provisions of this Order (including the Carveout) shall (a) inure to the benefit of the Debtors and M&I Bank, and they shall be binding on (i) the Debtors and their successors and assigns, including any trustees or other legal representatives of the Debtors or their bankruptcy estates that may be appointed in these Chapter 11 Cases or any subsequent chapter 7 case and (ii) all creditors of the Debtors and other parties in interest and (b) shall survive the entry of any order dismissing the Debtors' Chapter 11 Cases or converting such cases to chapter 7 cases.

10. This Court retains jurisdiction to enforce all provisions of this Interim Order.

11 This Order shall be effective immediately on execution, notwithstanding the possible application of any applicable law or procedural rule.

12 Nothing in this Order shall constitute an adjudication of the validity, priority or extent of M&I Bank's liens, or the amount of its claim, and all rights, claims and defenses with respect thereto are expressly preserved for the Debtors and any Committee that has or may be appointed in these Chapter 11 Cases.

**DONE** and **ORDERED** in Ft. Myers, Florida on __________________________.

________________________________________

United States Bankruptcy Judge

Copies furnished to:
Debi Evans Galler, Esq., Berger Singerman, P.A., 200 S. Biscayne Blvd., Ste. 1000, Miami, FL 33131.